**UNITED STATES of America**

**v.**

**Nelson NAVARRO, Defendant.**

**No. 91 Cr. 0301 (KTD).**

United States District Court, S.D. New York.

June 25, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Kenneth L. Wainstein, Asst. U.S. Atty., of counsel), for U.S.

Guzman & Velez, Bronx, N.Y. (Rudy Velez, of counsel), for defendant.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

On March 8, 1991 defendant Nelson Navarro, a/k/a Neno Sanchez–Medina, was arrested by agents of the Drug Enforcement Administration ("DEA"). Navarro was indicted on April 5, 1991 and charged with use of a firearm in furtherance of a drug trafficking crime, conspiracy to possess and possession with intent to distribute a Schedule I controlled substance, namely, one kilogram and more of a mixture containing a detectable amount of heroin in violation of 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(A), and 846; 18 U.S.C. § 2. On May 13, 1991, Navarro brought on an omnibus motion for various types of relief. A hearing was conducted on June 14, 1991, at which time the bulk of this motion was resolved. *See* Minutes of Hearing dated June 14, 1991. The only issue left to be resolved regards Navarro's motion to suppress physical evidence. Navarro predicates this part of the motion on the validity of the search warrant. On the hearing date, I determined Navarro's right to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to challenge and have the court determine the validity of the information underlying the search warrant application. The following constitutes my findings of fact and conclusions of law relevant to the validity of the underlying search warrant.

## STATEMENT OF FACTS

On March 7, 1991, agents of the Drug Enforcement Administration ("DEA") were contacted by a confidential informant ("CI") who was working under the direction of the DEA in Puerto Rico. The CI told the agents that he had travelled to New York for the purpose of contacting an individual known to him as "Neno" Sanchez–Medina. The CI said that Neno was a heroin trafficker who had been responsible for sending shipments of heroin from New York City to Puerto Rico on at least twenty previous occasions. Hired by Neno as a courier, the CI had been instructed to contact Neno in New York City in order to pick up the heroin. At the time he first contacted the agents, the CI knew that Neno lived in an Apartment numbered 508 at an otherwise unknown street address in Manhattan and that he had a telephone number of (212) 473–7362. He also knew that Neno's wife in New York was named "Thelma."

DEA agents surveilled a meeting on March 7, 1991 between the CI and Neno (a/k/a Navarro) near the corner of Sixth Avenue and Fourteenth Street in the borough of Manhattan. Navarro drove to the meeting in a brown Buick that was registered to a Thelma Cortijo, at 210 Stanton Street, Apartment 508. After picking up the CI, Navarro purportedly drove him to a storefront on Delancey Street. This was as reported by the CI to the DEA agents because the agents had lost track of Navarro's car. Thinking originally that they were to end up at the Stanton Street address, the DEA agents drove to that location and thus were unable to view the meeting on Delancey Street. The agents were later told that Navarro took delivery of a quarter kilogram of heroin, before he and the CI departed for a location in the Bronx.

The next day, according to the CI, he went to Navarro's apartment at 210 Stan-

ton Street.[1] He reported to the DEA agents afterwards that while inside Apartment 508, he had observed large quantities of cash and approximately two kilograms of heroin, in addition to the quarter kilogram he had seen Navarro pick up the day before. On the basis of this information, the Government obtained a search warrant on March 8, 1991, from Magistrate Judge Naomi Reice Buchwald for the premises known as 210 Stanton Street, Apartment 508. The affiant for the search warrant, DEA agent John Reilly, admittedly received his information from the CI.

When the DEA agents executed the warrant that evening, they seized approximately 3,450 grams of heroin individually wrapped in glassine envelopes, approximately $7,000 in United States currency, a loaded .38 caliber revolver, and various narcotics paraphernalia.

On March 11, 1991, Magistrate Judge Kathleen A. Roberts issued a warrant for Navarro's arrest, and the next day, he was arrested in the Bronx. At the time of his arrest, $4,000 in cash was seized from the van that he was driving. Nothing more was seized from the van that day.

## DISCUSSION

■ Navarro moves, *inter alia*, to suppress the introduction of the money, drugs, drug paraphernalia, and .38 caliber pistol which were seized from his apartment at 210 Stanton Street on March 8, 1991 pursuant to an allegedly invalid search warrant. In challenging the search warrant, Navarro presents a single factual contention. He alleges that he was absent from his apartment on the morning of March 8, 1991, preceding the arrest. Specifically, Navarro claims that the CI could not have entered the apartment that morning to meet Navarro because Navarro was in transit to purchase a car in Pennsylvania. Navarro thus argues that Reilly's claim that the CI was in the apartment must be false.

■ Absent a showing that the affiant himself knowingly included false statements in the affidavit, there is a basis neither for a hearing, nor for suppression itself. *United States v. Barnes*, 604 F.2d 121, 152–53 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Probable cause is not defeated because an informant may have erred or lied so long as the affiant accurately represented what was told to him. *United States v. Merchant Diamond Group, Inc.*, 565 F.2d 252 (2d Cir.1977).

At the hearing, Reilly, one of the DEA agents on surveillance, testified that the CI was reliable. Reilly based his confidence on the CI's consistently reliable information, resulting in the arrests and convictions of drug dealers in Puerto Rico, unrelated to those indicted here. Moreover, much of the CI's information in this case was consistent, true, and logical. The CI knew that the heroin dealer dwelled in an apartment 508 and that his wife's name was Thelma. As it turned out, Navarro lives with his wife, Thelma Cortijo, along with their three daughters, at apartment 508 on 210 Stanton Street. Also, the phone number that the CI gave to Reilly as well as the car that Navarro drove were listed to Thelma Cortijo of 210 Stanton Street. Additionally, the CI told agent Reilly with great precision of the existence of the gun, drugs, and drug paraphernalia located in Navarro's apartment.

Navarro, on the other hand claims that he left his apartment at 7:00 a.m. to drop his daughters at school. He then claims to have met another individual by 8:00 a.m. and immediately left for his excursion to Pennsylvania. At 9:28 a.m., the morning of March 8, 1991, Navarro received a speeding ticket in New Jersey, just outside the Holland Tunnel. Although Navarro received a speeding ticket outside the Holland Tunnel at 9:28 on the same morning that the CI claims to have been inside the apartment, that does not render the affiant's statements underlying the warrant

---

1. The underlying fact is in dispute. Navarro took the stand and testified that the CI could not have been at 210 Stanton Street at the time claimed because Navarro was on his way to Pennsylvania at the time. A traffic ticket was presented Navarro just outside the Holland tunnel at approximately 9:28, the Morning of March 8, 1991.

false or the CI's reports unworthy of belief. Stanton Street is located in lower Manhattan. Likewise, the Holland tunnel is in lower Manhattan. It is not implausible that the CI was in Navarro's apartment just prior to Navarro's trip to Pennsylvania. Moreover, I find it highly unlikely that it would have taken approximately one and one-half hours even in the heaviest of rush-hour traffic to get from one location in lower Manhattan to another location just outside lower Manhattan.

Furthrmore, I found Navarro's testimony at the hearing to be completely incredible. When questions were directed to Navarro which answers would ultimately inure to his benefit, Navarro answered with great speed and spontaneity while hesitating and repeating those questions that he found adverse to his position. This would not be so impressive if Navarro's hesitation was in response to cross-examination alone, but he had great difficulty recreating and reporting the events on the morning of March 8, 1991 even in response to questions posed by his own counsel.[2]

Without a showing that the affiant's information in the Affidavit did not constitute a good faith account of that which the CI told him, even if the information is inaccurate, it does not invalidate the search warrant. *Franks v. Delaware*, 438 U.S. at 171, 98 S.Ct. at 2684. Navarro wholly failed to make any showing whatsoever that the CI was lying about the events of that morning. Even assuming that the CI's information was inaccurate, Navarro has shown no evidence that Reilly recklessly included the CI's version of the morning's events in the affidavit. Without such a showing, the agent's good faith account of what the CI told him in the Affidavit stands. There is nothing to suggest that Reilly willfully or recklessly misrepresented the facts when he included in the Affidavit the CI's account of his observations in Navarro's apartment. Certainly, there is nothing in the record which would suggest that the CI was not in the apartment even in light of the fact that Navarro received a speeding ticket that same morning. Indeed, both events could have easily occurred and one event does not preclude the possibility of the other.

For the foregoing reasons, Navarro's motion to suppress the physical evidence and challenge the validity of the search warrant Affidavit is denied. All other rulings as per the hearing minutes of June 14, 1991 are confirmed.

SO ORDERED.

---

**2.** This evaluation accounts for Navarro's seemingly poor command of the English language. Although Navarro had an interpreter during the rest of the proceedings, he chose to have questions asked and to speak in English. Even in light of Navarro's heavily accented speech, he had a good command of the English language and answered those questions which were favorable to his position with great ease and proficiency.