**UNITED STATES of America**

v.

**Steven A. SILVERS.**

**Crim. No. Y–87–0144.**

United States District Court,
D. Maryland,
Northern Division.

June 2, 1995.

Lynne A. Battaglia, U.S. Atty. Dist. of Md., Baltimore, MD, Andrew G.W. Norman, Asst. U.S. Atty., Baltimore, MD, for Government.

Gerald C. Ruter, Baltimore, MD, for defendant.

## MEMORANDUM AND ORDER

HERBERT N. MALETZ, Senior District Judge, sitting by designation.

### I. *Introduction*

On February 2, 1988, defendant, Steven A. Silvers, was found guilty by a jury of (1) conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, (2) operating a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848, (3) three counts of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841, (4) two counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952, and (5) conspiracy to defraud the United States in violation of 18 U.S.C. § 371. On April 11, 1988, defendant was sentenced by the court to a prison term of 35 years on the CCE count, concurrent 15-year sentences on each of the possession with intent to distribute convictions, and concurrent five-year sentences on the remaining substantive charges and on the § 371 conspiracy. Defendant's conspiracy conviction, under 21 U.S.C. § 846, was vacated by the court as a lesser included offense of CCE.

Presently pending before the court is defendant's motion, pursuant to 28 U.S.C. § 2255, to have the verdicts against him set aside and for a new trial. Defendant's motion initially presented thirteen grounds for relief. By Memorandum and Order dated October 31, 1994, the court dismissed claims # 5, # 7, # 8, # 9, # 10 and # 12 of defendant's motion, finding them to be without merit as a matter of law.

Defendant's remaining claims each relate to the undisputed fact that a government witness, John Gerant, perjured himself at defendant's trial. That Gerant committed perjury has already been determined by this court. *See United States v. Gerant,* 775 F.Supp. 182 (D.Md.1991) (Harvey, J.). Defendant contends that in light of Gerant's perjury, his CCE conviction must be vacated and a new trial ordered.[1]

On November 28, 1994, the court commenced a nine-day evidentiary hearing on defendant's motion. Having considered the testimony and exhibits from that hearing, as well as the parties' voluminous written submissions[2] and the entire record in this case, the court is prepared to rule. For the reasons explained below, defendant's CCE conviction will be vacated and a new trial ordered. His conspiracy conviction, however,

---

1. While defendant's papers are not clear on this point, defense counsel explicitly stated at the evidentiary hearing held on defendant's motion, that defendant's remaining claims pertain only to his CCE conviction.

2. Both parties have submitted briefs of more than 160 pages in this case.

will be reinstated, and defendant will be re-sentenced on that charge.[3]

## II. Background

### A. Defendant's Trial

The evidence produced by the government at trial primarily concerned (1) defendant's involvement in the early 1980's with what the government has termed the "Marshall Jones drug organization," and (2) defendant's participation in two massive importations of cocaine and marijuana from Colombia in the summer of 1985. As to these latter two transactions, which the parties have consistently referred to as "loads 1 and 2," the government's only witness was John Gerant.

### 1. Defendant's Involvement with Marshall Jones

Defendant became acquainted with Marshall Jones in the fall of 1980, through Alan Greenwald. Greenwald, in addition to being Jones' partner at that time in narcotics trafficking, was renting a house from defendant in Sunrise, Florida. Jones, who had recently moved to Florida so as to obtain narcotics at a cheaper price, had developed a thriving drug-dealing business in and around his home state of Maryland. Jones regularly supplied large quantities of cocaine to several dealers in Maryland, Virginia and Washington, D.C. These included Raymond Carnahan, Donald Watkins, Charles Hamilton and Tuck Koontz. Jones' source for the cocaine was Jorge Torres, who was employed as a clerk at the Nautilus Hotel in Miami Beach. Either Jones or a courier would drive the cocaine up to his customers, who would then dilute and resell it as each saw fit. After selling the cocaine, Jones' customers would then pay him their agreed upon price.

Jones testified that at their initial meeting, defendant offered to supply him and Greenwald with cocaine. Defendant advised that he was friendly with two pilots who were transporting large loads of cocaine into the Ft. Lauderdale Airport. (One of these pilots was John Gerant.) Jones, however, was un-happy with a sample of defendant's cocaine and decided not to buy any.

In late 1980, defendant, a fledgling entrepreneur in the Florida entertainment industry, approached Jones with a plan to launder his drug money. Defendant advised that for a ten percent commission, he would be willing to launder a salary of $25,000 a year through his talent agency, Silver Touch Talent. Jones readily agreed to this plan and Jones was thereafter paid a weekly "salary" of $500 as a phony employee of the talent agency. Jones also purchased a 25 percent share of the business for $58,000. In this manner, defendant also laundered drug money for Jones' regular customer, Donald Watkins and George Chaconas, another narcotics trafficker.

In the summer of 1981, defendant talked Jones into investing more of his drug money into another of defendant's ventures, a recording studio in which Jones' musically inclined brothers could record an album. Jones initially invested $90,000 toward the purchase of a building, and an additional $100,000 for musical equipment. In connection with this investment, additional businesses were created, one called J & W Productions, which stood for Jones and Watkins. This entity was ostensibly a production company producing musical acts at the recording studio. In point of fact, it became another vehicle through which bogus salaries could be paid out to both Jones and Watkins.

In April of 1981, defendant and Jones engaged in their first substantial narcotics transaction together, the importation of 400 pounds of marijuana from Jamaica. Defendant's role in this importation was to arrange for the transportation of the marijuana by Gerant. Jones and Greenwald picked out the marijuana that they wanted, purchased it for $150,000 and then took possession of it once it arrived in Florida. Defendant was paid $50,000 plus expenses which he shared in some manner with Gerant. Jones' testimony in this regard was corroborated by both Ger-

---

3. For the sake of simplicity, the court will employ the same method as that used by the parties in referring to transcripts of the various proceedings in this case. References to the transcript of defendant's trial will be labeled "ST." Refer-ences to the transcript of the evidentiary hearing on the instant motion will be designated as "EH." Finally, reference to the transcript of the pretrial hearing which was held in *United States v. Gerant* will be labeled as "GT."

ant and Watkins who also was involved in this importation.[4]

Defendant's involvement with Jones and his customers escalated significantly in April of 1982 when Jones was incarcerated on a marijuana trafficking conviction. In an effort to continue his profitable business while he was in prison, Jones introduced defendant to several of his other customers, Tuck Koontz, Ray Carnahan and Charles Hamilton. Jones advised each of them that from now on they could pick the cocaine up directly from Jorge Torres, and subsequently make payment to defendant. In return for collecting Jones' drug money, defendant was to receive a 50 percent cut of Jones' profits.[5]

Soon after Jones' incarceration in April 1982, defendant advised Jones' customers that, for a fee of $750 a kilo, he would be happy to deliver the cocaine directly to them, so that they would not have to travel to Florida to pick it up. Jones' customers accepted this offer and during the 11 months Jones was in prison, defendant and/or his brother Gary delivered kilo quantities of cocaine to them approximately seven to ten times.[6] As had been the case with Marshall Jones, Jones' customers continued to freely dilute and sell the cocaine as they saw fit, including the setting of price, without any instructions or restrictions from defendant or Jones.[7] Their one obligation to defendant was simply to make payment. In this regard, defendant often requested that payment be made by check to one of his business entities. Upon Jones' release from prison, defendant's involvement with Jones' customers came to an end.[8]

The evidence against defendant with respect to his participation in a narcotics conspiracy involving Jones and his customers was overwhelming. The government presented the mutually corroborative testimony of Jones, Watkins, Hamilton, Carnahan, and Todd Lovett, an associate of Hamilton's. In addition, the government introduced into evidence a July 1982 letter which the defendant sent to Marshall Jones in prison detailing, in a thinly veiled manner, the number of deliveries and the amount of cocaine that had been provided to each of Jones' customers and the amounts that they had paid and still owed. Finally, the government offered into evidence signed receipts for the cocaine that defendant obtained from Jones' customers.

### 2. *John Gerant and "Loads # 1 and # 2"*

John Gerant, a licensed pilot and former Miami police officer, testified pursuant to an oral plea agreement that he entered into with the government.[9] Gerant testified that he first became involved in narcotics trafficking in 1979, flying large loads of cocoa paste into this country from Colombia. Like Marshall Jones, Gerant's initial business dealings with defendant involved the laundering of his narcotics earnings. In 1980, Gerant invested $25,000 in defendant's talent agency, in return for which he received a bogus weekly salary of $500.

---

**4.** Defendant similarly arranged transportation for a second load of 800 pounds of marijuana in October of 1981. Gerant, however, decided at the last moment not to transport this load, and it was later stolen prior to importation. Jones testified that he was subsequently given three kilograms of cocaine by defendant and Gerant to make up for the stolen marijuana.

**5.** At that time, Jones was paying Jorge Torres $52,000 per kilo and was in turn charging his customers $72,000. Jones' customers were in turn making about $40,000 per kilo profit after diluting the cocaine and selling it to their own dealers/customers.

**6.** On one occasion, an individual named Darryl Hughes also acted as a courier for defendant.

**7.** As Charles Hamilton stated succinctly at trial: "the deal we had with Steven Silvers was I, we,

pay him and we get the cocaine from him." (ST 361). In this regard, Jones' customers would call defendant when they were ready to purchase additional cocaine (*id.*). As far as Jones' customers were concerned, Jones and defendant were simply middlemen between them and Jorge Torres. (ST 401).

**8.** Hamilton, Watkins and Carnahan testified that they were unhappy with the quality of the cocaine that they were receiving from defendant and suspected that he was diluting it, and/or obtaining it from someone other than Jorge Torres. Because of this, Carnahan, on one occasion, purchased cocaine from another source.

**9.** Pursuant to this agreement, the government agreed that, in return for Gerant's truthful testimony, he would not be prosecuted for any past narcotics offenses. Gerant agreed to plead guilty only to a misdemeanor income tax charge.

Gerant testified that in late 1982, defendant and Marshall Jones invested $176,000 toward a large importation of cocaine from Colombia.[10] Gerant stated that he had learned of the availability of this cocaine from a fellow pilot, David Butler. Gerant testified that the $176,000, and an additional $400,000 that Butler had raised, was provided to an unidentified Colombian male at Butler's home. The expected cocaine, however, never materialized.

As to the infamous loads #1 and #2, Gerant testified that in the spring of 1985, he transported load #1, totalling 117 kilograms of cocaine and 250 kilograms of marijuana from the Bahamas into the United States.[11] Gerant claimed that defendant had done all of the logistical planning for this massive importation and that defendant had provided him with over $100,000 for the purchase of two airplanes. Gerant further testified that defendant's source for this cocaine was a Colombian named Allan Rudd. Rudd and defendant had been introduced by a mutual friend, Anthony DeAntoni. According to Gerant, after the successful importation of load #1, defendant paid him his transportation fee of $1,000 per kilo, and along with Rudd and DeAntoni took possession of the cocaine for further distribution.

Gerant testified that soon after the importation of load #1, defendant began speaking with him about transporting a second load of more than 600 kilograms. According to Gerant, it was again defendant who arranged the meetings amongst the many co-conspirators and provided the plan of operations. Gerant testified that ultimately only 300 kilograms were imported and that defendant again paid him his transportation fee and provided him with a list of the people to whom the cocaine should be distributed.

### 3. Gerant's "Cooperator" Testimony And the Government's Response

In connection with his testimony concerning the unsuccessful David Butler venture discussed above, Gerant testified, on direct examination, that he believed Butler to be an FBI operative and that Butler had requested his assistance. Gerant further stated that when he dropped off the $176,000 at Butler's home, he observed surveillance agents pretending to be joggers.[12] The lead government counsel, hereafter Assistant United States Attorney (AUSA) intentionally elicited this information in an attempt to "establish [Gerant's] credibility for the jury." (GT 68)

The government also attempted to elicit similar such testimony concerning Gerant's relationship with one Claude Green, a pilot with whom Gerant imported his initial cocoa paste loads mentioned above. In connection with the government's attempt in this regard, the following colloquy with the court occurred:

THE COURT: Let me ask you where you intend to go with this witness?

AUSA: Your Honor, Claude Green is the person that he is about to state made statements to him. Claude Green is a conspirator, according to his testimony already given, and I think that the statement is admissible to show the reason why this witness did what he did at the time. It is not offered for the truth of it. It is offered to show his state of mind at the time that he did these actions. In other words, he is going to state that he understood that Claude Green was an informant, and that the DEA knew about these flights, and it is offered to explain why he involved himself in three flights of cocoa paste.

THE COURT: What would he testify to insofar as Claude Green is concerned?

AUSA: Claude Green says I am an informant. I work for agent so and so with the narcotics in the Bahamas pending importation into the United States.

---

**10.** According to Gerant, defendant later acknowledged that Jones contributed $140,000 of this money. Jones, for his part, denied any recollection of this transaction.

**11.** The narcotics had previously been brought to the Bahamas from Colombia by another pilot, William Spradley. According to Gerant, defendant had a connection in the Bahamas, J.R. Rowle, who was able to ensure safe storage of

**12.** Gerant testified that FBI agents Copias, Dugger and McNeil were aware of this planned importation. He did not indicate, however, whether these individuals were the surveillance agents that he saw outside Butler's home.

the DEA. Go ahead and do what they ask you to do and whatever money you get declare the money on your taxes. It is offered to show why this witness acted the way he did on these occasions.

MR. IRWIN: You are trying to justify, in other words, why he would do these loads. You're going to say that he thought he was working for the government.

AUSA: That is what he's going to say. (ST. 1066, 1067).

Government counsel did not, in fact, go on to elicit this testimony concerning Claude Green as he did in regard to David Butler. He did, however, bring out Gerant's belief that two law enforcement officials were aware of his importation of the cocoa paste; Elena Cox of the DEA and an Agent Funes of the Florida Department of Law Enforcement.

Having heard this testimony on direct examination, defense counsel sought to have Gerant elaborate upon his relationship with law enforcement during his narcotics trafficking career. In response to defense counsel's questioning, Gerant testified that he had been an informant to the DEA, the Florida Department of Law Enforcement, United States Customs and the FBI. Gerant further testified that, while he had received compensation of less than $3,000 from these agencies, he had been told that he could keep his earnings from narcotics trafficking as long as he declared them on his taxes.

The day after hearing Gerant's testimony on cross-examination, government counsel advised the defense, and the court, that the prosecution had been unable to confirm Gerant's claims. Several days later, the government's case agent, acknowledged, on cross-examination, that he had been unable to verify Gerant's claims with either the DEA or the FBI.[13]

4. *The Government's Closing Argument*

Despite his belief that Gerant had perjured himself on cross-examination (EH 303), government counsel strongly suggested to the jury during closing argument that Gerant,

like the government's other witnesses, had testified truthfully:

You have to consider with great care and caution the testimony given to you by individuals who have entered into plea agreements. However, remember what the plea agreements said. The plea agreements said that they would receive no further charges if they gave truthful testimony. And so the motivation for the witnesses, when they take the stand, is to tell the truth and tell the truth only, because if they don't, that is the only way they can get into further trouble, the only way.

\* \* \* \* \* \*

Now Gerant told you again that he was required to tell the truth and if he lied he can be prosecuted for everything that he has told us about. So he has perhaps more than any other individual, he has the most to lose by lying because all of the cocaine transactions that he was involved in with the defendants Steven Silvers and Gary Silvers. (ST 5635, 5646).

In so arguing, government counsel failed to mention Gerant's claim that he had been a government informant. Government counsel instead focused upon a mistake which Gerant made regarding his initial marijuana importations with defendant and Marshall Jones. In this regard, government counsel argued to the jury that Gerant had simply made an innocent error, as opposed to an intentional falsehood:

Jerry Gerant made a mistake as to which of the two marijuana trips in 1981 that Donny Watkins was along on. He testified that Donny Watkins was along on one when he was, in fact, along on a different trip. And we know that he is mistaken because both Jones and Watkins put him on the other marijuana trip. Does that mean that the other marijuana trips didn't happen, or that Jerry Gerant was lying? Of course not. It means that Jerry Gerant made a mistake, which is understandable. (ST 5635–36).

Government counsel also made reference to testimony that Gerant had provided in a

---

13. The agent testified that he had not attempted to verify Gerant's claims with respect to United

States Customs or the Florida Department of Law Enforcement.

Florida prosecution of several of his fellow police officers. In so doing, government counsel essentially suggested to the jury that Gerant had a track record for testifying truthfully and that he would do so regardless of the personal cost:

> In the *McDuffy* case, you heard a lot about the *McDuffy* case, as you know, when Jerry Gerant was a Miami police officer he witnessed the brutal murder of an individual by several police officers. I think the sum of his testimony and, of course, you will recall his testimony, is that initially he didn't exactly come across with everything that he saw, he didn't lie he just didn't volunteer the information. However, when push came to shove he did the right thing, he went to court, and he testified under oath against the police officers who had murdered this man. And what that shows you is that when it got down to it, when it was really time to decide what was right and what was wrong, that Gerant decided under oath that whatever the cost that he would tell the truth and, you know that he lost ten years' worth of friends, as he put it, from doing that, because all of his friends were police officers didn't want to have anything to do with him anymore since he had testified against police officers. (ST 5647–48).

Finally, government counsel also continued to make use of Gerant's purported belief that some of his drug dealings had been undertaken with the tacit consent of the government:

> Gerant told you that about 30 percent of the time he felt that the things that he was doing were known to law enforcement because of people that he was working with he felt were informants. But the other 70 percent of the time he said from the stand he was dead wrong what he did, absolutely, so he was not trying to hide anything from you. (ST 5648).

---

14. Rudd further stated, contrary to Gerant's testimony, that it was he, and not defendant, who paid Gerant.

15. Rudd did state that it was defendant and DeAntoni who initially approached him about the

### B. *The Post–Trial Developments*

Following defendant's conviction and sentencing, the government continued its investigation of the international drug trafficking network of which defendant was a part. In August of 1988, Special Agent Smith interviewed Allan Rudd who had been arrested the previous year. Rudd provided a significantly different account of loads #1 and #2 than Gerant had, especially with respect to the roles that defendant and Gerant played. According to Rudd, Gerant was not merely a pilot as he depicted himself at defendant's trial, but the true boss of the American end of the operation. In connection with the government's prosecution of Gerant, Rudd testified that it was Gerant who had the planes, the connections in the Bahamas, and the warehouse in the United States to store the cocaine. Accordingly, it was not defendant but Gerant who dictated the plan of operations. In this regard, Gerant also demanded and was paid, not the $1,000 per kilo that he testified to, but $6,000 a kilo, for a total of more than a million dollars.[14]

According to Rudd, while defendant always attempted to act like a boss, he actually did little more than to provide Rudd with his introduction to Gerant. Rudd stated that defendant had no ownership interest in the cocaine once it was imported and that he was simply to be paid a commission for his part in connecting Gerant with Rudd.[15]

In June 1989, the case agent interviewed an associate of Rudd's, Victor Pesantes, who was also involved in loads #1 and #2. His version of those events coincided with Rudd's. In August of 1989, the AUSA and the case agent met with Gerant and his attorneys to apprise them of the government's concern that he had testified untruthfully. Gerant stated that he stood by his testimony.

In May of 1990, Anthony DeAntoni, his son

possibility of doing transactions of this magnitude. Defendant and DeAntoni represented to Rudd that they controlled a transportation organization (Gerant) capable of importing such large quantities.

Richard, and several other individuals[16] involved in loads # 1 and # 2 were arrested. They had all been charged by a sealed indictment the previous November. Following the arrest of DeAntoni and the others, the government for the first time provided defendant and his counsel with the case agent's reports of his interviews with Rudd and Pesantes.

Trial commenced in the *DeAntoni* case on January 10, 1991. Shortly before the start of trial, Richard DeAntoni and Steven Sharp decided to cooperate and plead guilty. Mid-trial, Anthony DeAntoni did likewise. Each of these individuals corroborated Rudd's version of loads # 1 and # 2. On April 10, 1991, the remaining defendants, John Kay and David Seeright, both associates of Gerant, were convicted.[17]

On April 25, 1991, Gerant was arrested and charged with conspiracy to distribute cocaine and marijuana. Gerant moved to dismiss the charges against him on the basis of his agreement with the government. The government, in response, argued that Gerant had breached the agreement by perjuring himself at defendant's trial. On October 3, 1991, following a two-week hearing, Judge Alexander Harvey, II, of this court denied Gerant's motion to dismiss, finding that Gerant had lied in three material respects: first, that Gerant was not a mere pilot or transporter of narcotics as he claimed, but rather, a "principal participant;" second, that Gerant

falsely testified that his total earnings from narcotics trafficking was $550,000 when his actual earnings, in 1985 alone, were at least "three times that figure," and third, that Gerant falsely claimed that he had been acting since 1982 as a government informant. *United States v. Gerant,* 775 F.Supp. at 187.

In regard to Judge Harvey's last finding of perjury, Gerant's counsel strenuously contended that Gerant honestly believed that he was acting as a government informant because he was assisting people who had represented to him that they were informants. Judge Harvey rejected this "agency theory" of cooperation. *Id.* at 188. Judge Harvey recognized that, "as knowledgeable as [Gerant] ... was about law enforcement activities, he could not have, and did not in fact believe that he was cooperating with government agents with their knowledge and approval." *Id.*[18]

On May 26, 1992, defendant filed a motion for a new trial. The motion was subsequently dismissed because it was untimely filed.[19] On April 28, 1993, defendant filed the instant motion under 28 U.S.C. § 2255. Defendant's remaining claims, all of which relate to Gerant, are as follows:

    1. The government included false information supplied by Gerant in an application for a warrant to search defendant's home.

    2. Gerant's perjured testimony deprived defendant of due process of law.[20]

---

**16.** These included another pilot, Steven Sharp, David Seeright, Gerant's airplane mechanic, and John Kay, an associate of Gerant's who owned the warehouse in which loads # 1 and # 2 were initially stored in the United States.

**17.** In his defense, Seeright contended at trial that he believed that Gerant was a government informant, and that he felt that by assisting Gerant he was aiding the government. Seeright presented this assertion to an AUSA at a pretrial proffer session. This AUSA, who had second chaired the government's prosecution of defendant, terminated the proffer session immediately upon hearing this, finding Seeright's claim to be absurd. The government has failed to explain why it immediately recognized Seeright's claim of "vicarious cooperation" to be a lie, but credited Gerant's claim, as seen by the fact that it was deliberately elicited during his direct testimony. As the lead AUSA in the Silvers case has recognized, the

government's actions in this regard "clearly [are] not consistent." (EH 351).

**18.** Gerant was subsequently found guilty by a jury on all counts charged against him, and on February 28, 1992, he was sentenced to 35 years imprisonment.

**19.** Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, defendant had two years from the date of final judgment to file a new trial motion based on newly discovered evidence. Final judgment in this case occurred when the Fourth Circuit issued its mandate on November 17, 1989.

**20.** As a separate claim, defendant asserts that the government knew, or should have known, of Gerant's perjury. As will be discussed further below, the issue of the government's knowledge, or lack thereof, is intertwined with defendant's due process claim and as such the two claims will be treated as one.

3. Government counsel impermissibly vouched for the credibility of Gerant during closing argument.[21]

4. The government failed to timely provide discovery relating to Gerant.

5. The court sentenced defendant, in part, upon Gerant's false testimony.

### C. *The Evidentiary Hearing*

During the nine-day evidentiary hearing on the instant motion, the court heard testimony from the AUSA, the case agent, defendant's trial counsel David B. Irwin, and defendant himself.[22] The primary issue addressed at the hearing was the history of the government's relationship with Gerant. In this regard, the AUSA and the case agent both testified that they became aware of Gerant in early 1987, at which time a Grand Jury subpoena was issued upon him. An attorney for Gerant then contacted the AUSA and indicated Gerant's willingness to cooperate. Gerant's attorney also indicated that Gerant's last involvement with narcotics trafficking had been in 1984 or 1985.

A proffer session with Gerant was held on February 5, 1987. At that meeting, an FBI agent questioned Gerant as to whether he, in fact, had been involved in a drug transaction just two weeks earlier. Gerant indicated that he had. This revelation led to a brief interruption of the meeting during which time Gerant met privately with his attorneys. The meeting then resumed and over the next half hour Gerant briefly described various drug transactions that he had participated in as a pilot. Despite Gerant's misrepresentation to his attorneys, and through them the government, concerning his last involvement with narcotics trafficking, the government elected to enter into the above-discussed plea

agreement with Gerant at the conclusion of this brief proffer session.

Following the proffer session, the case agent debriefed Gerant on February 6, 1987. A significant portion of the information Gerant provided, such as his and defendant's involvement with Marshall Jones in the early 1980's, was corroborated by other information that the case agent had obtained in his more than two years of investigation. Gerant's accounts of loads # 1 and # 2, however, could not be confirmed.

In March of 1987, the case agent submitted an application for a search warrant of defendant's home and recording studio to Magistrate Judge Peter Palermo. In his affidavit, the case agent included information provided by Gerant concerning loads # 1 and # 2. The warrant ultimately was issued and a multitude of documentary evidence seized. Among these were documents demonstrating that defendant had, in fact, been in the Bahamas during the relevant time periods provided by Gerant for loads # 1 and # 2.

In November of 1987, Gerant met with the AUSA and the case agent in preparation for defendant's trial. During these preparation sessions, Gerant claimed, for the first time, that with respect to some of his drug transactions he was assisting federal informants, who were being surveilled by actual federal agents.[23] In the Ausa's terms, Gerant was essentially claiming to have been a "vicarious cooperator." (EH 391). Gerant stated to the AUSA that since he had not been arrested, he believed that he was "okay" for assisting these "informants," as long as he reported his income from these transactions on his tax returns. The AUSA testified that he specifically questioned Gerant as to whether he had talked directly to the federal agents

---

21. This claim will also be addressed in conjunction with defendant's second claim for relief.

22. Testifying against the strong advice of his counsel, defendant essentially acknowledged his participation in the narcotics conspiracy for which he was convicted, but denied having supervised, organized or managed five or more people as is necessary for a conviction under the CCE statute.

23. As in his trial testimony, Gerant referred specifically to his initial smuggling of cocoa-paste

loads and to the David Butler venture discussed above. There was one apparent discrepancy, however, between what Gerant stated at the pretrial preparation session and what he testified to at trial. According to the AUSA, Gerant indicated prior to trial that it was Ben Rhodes who he was working with on the cocoa-paste loads. But at defendant's trial, both Gerant and the AUSA referred to Claude Green instead. No explanation has been provided to the court for this discrepancy.

themselves and that Gerant's answer was in the negative. Neither the AUSA nor the case agent, however, pressed Gerant as to how a former Miami police officer could possibly believe that it was lawful to engage in narcotics transactions simply because an alleged government informant was also participating. In this regard, the case agent acknowledged that he, in fact, "did not believe" Gerant's claim of vicarious cooperation. (EH 470). Accordingly, the case agent did not bother to investigate the claim, but instead "dismissed it" as a "convenient excuse" or "rationale." (EH 470, 471, 474).

The AUSA and the case agent both testified that they were completely surprised by Gerant's testimony, on cross-examination, that he had acted as an informant. As they both emphasized, informants, upon getting in trouble with the law, will immediately make their informant status known in order to avoid prosecution. It is uncontroverted that, prior to his cross-examination, Gerant never professed to being an actual informant. Upon hearing Gerant's testimony in this regard, the AUSA asked the case agent to check Gerant's claims with the various agencies. As discussed above, the case agent was unable to verify any of Gerant's assertions.

Finally, the AUSA testified that at the time that he delivered his closing argument to the jury, he believed that Gerant had testified falsely with regard to his informant status. The AUSA stated that, in his view, the government, by the conclusion of defendant's trial, had probable cause to indict Gerant for perjury. However, the AUSA testified that he also felt that the case agent's testimony had made clear to the jury that Gerant had lied in regard to his cooperator testimony. He thus believed that his closing remarks were an appropriate effort to salvage the remainder of Gerant's testimony.

## III. *Discussion*

### A. *The Search Warrant Claim*

■ Defendant contends that the search of his home was illegal because the affidavit submitted by the case agent contained false information supplied by Gerant. While defendant fails in his motion papers to specify what in the application is erroneous, the government concedes that the affidavit contains false information concerning loads #1 and #2; specifically, the second and third sentences of paragraph 78 which state as follows:

> Silvers and DeAntonio (sic) purchased an aircraft from CI #4 [Gerant] for $72,000 cash, which was paid to CI #4 by S. Silvers to fly large loads of cocaine directly from Colombia through the Bahamas and into the SDFL. Later, in or about May 1985, S. Silvers and DeAntonio purchased a second aircraft from CI #4 for $60,000 in cash.
>
> S. Silvers eventually paid CI #4 about $90,000 cash for nine kilograms of the cocaine.[24]

In response to this claim by defendant, the government correctly points out that because defendant did not challenge the search of his home either at trial or on direct appeal, he must demonstrate both cause excusing his double procedural default and actual prejudice resulting from the error of which he complains. *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). In this regard, the government asserts that any attempt by defendant to demonstrate cause is "patently ludicrous" because defendant "must have realized the falsity of parts of the search warrant affidavit in 1987 before his trial." Government Answer at 19. It is the government, however, that is mistaken.

While defendant may have known that the information provided in the case agent's affidavit was false, he had no proof of this until well after his trial and appeal had been completed. *See United States v. Biberfeld,* 957 F.2d 98, 104 (3d Cir.1992). In *Biberfeld,* the Third Circuit recognized that as to the "cause" prong of *Frady,* the real issue is one of proof, as opposed to knowledge:

> ... [I]t is not enough to say that defendant's knowledge of perjury at trial is suf-

---

**24.** The government also concedes that the third and fourth sentences of paragraph 86 of the affidavit are incorrect insofar as they characterize the cocaine in question to have been the property of defendant.

ficient to bar a later challenge based upon it. The simple reason is that at trial, although each knows the truth, all they can do is trade accusations. Consequently, what is essential is the ability to act upon that knowledge.... It would be fundamentally unfair to [Biberfeld] to say that because he knew or believed at the trial that Dilauro was lying, he can now be barred from asserting it.... [I]f a 2255 movant can show that the factual basis for a perjury claim was not reasonably available to him or his counsel at trial, he has made a sufficient showing of cause to raise the perjury issue for the first time on collateral attack.

957 F.2d at 104.

As was the case in *Biberfeld*, any claim by defendant at the time of trial, or prior to trial, that the case agent's affidavit was false, would simply have amounted to his word against that of the case agent's informant (Gerant). It is only now that evidence of Gerant's perjury has developed, that defendant has a factual basis, and an ability, to present his claim. Accordingly, the cause prong of the *Frady* test has been satisfied.

■ Prejudice, however, is another matter. In this regard, defendant must demonstrate not simply that the case agent included Gerant's false information in the application for the search warrant but that the case agent either knew that the information was false, or acted with a deliberate disregard of the truth. *See Franks v. Delaware*, 438 U.S. 154, 184, 98 S.Ct. 2674, 2690, 57 L.Ed.2d 667 (1978); *United States v. Barnes*, 604 F.2d 121, 153 (2d Cir.1979) ("... [A]bsent a showing that ... [the agent] himself had knowingly included false statements in his affidavit, there is a basis neither for a hearing nor for suppression itself."); *United States v. Navarro*, 767 F.Supp. 544, 547 (S.D.N.Y.1991) ("Probable cause is not defeated because an informant may have erred or lied so long as the affiant accurately represented what was told to him."). It is uncontroverted that prior to his interviews of Rudd and Pesantes in 1990, the case agent did not know, or have

reason to know, that Gerant's information as to loads # 1 and # 2 was false.

In his post hearing memorandum, defendant contends, not that the case agent knew or should have known that Gerant was lying, but simply that the information should not have been included in the absence of specific corroboration. Defendant's Supplemental Memorandum at 4. Defendant fails to cite any authority to support this contention, and it is plainly at odds with the cases discussed above. Accordingly, while defendant has presented cause to challenge the search of his home, that challenge must ultimately be denied.

### B. *The Due Process Claim*

■ The question of whether perjured testimony requires a new trial depends upon the materiality of the perjury and the extent to which the prosecution was aware of it. A conviction obtained through the knowing use of perjured testimony by the government violates due process and must be reversed when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir.1994) (*quoting United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)). This standard applies regardless of "whether the government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected." *Id.*

In cases where the government is unaware of a witness' perjury, there is some division amongst the circuits as to the proper standard to be employed. The Second and Ninth Circuits, for example, have held that, in such circumstances, defendants must demonstrate that the jury "probably would have acquitted in the absence of the false testimony." *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992); *United States v. Krasny*, 607 F.2d 840, 844–45 (9th Cir.1979), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980).[25] The Seventh Circuit,

---

**25.** This "probability" standard is the same test that is generally employed throughout the Federal Circuits to new trial motions based on newly

discovered evidence. *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir.1993), *aff'd*, —— U.S. ——, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994);

by contrast, has traditionally employed a seemingly less rigorous standard, commonly referred to as the *Larrison* test, which requires defendants to demonstrate only that an acquittal "might" occur on retrial, rather than probably. *See Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928). While the *Larrison* test has been recognized by at least one commentator to be the majority rule, *see* 3 Charles A. Wright *Federal Practice and Procedure: Criminal 2d,* § 557 at 343 (1994), the current case law indicates otherwise. In addition to the decisions of the Second and Ninth Circuits discussed above, recent decisions of the Third, Fifth, Seventh and Eighth Circuits call into question the continuing validity of that test. *See United States v. Massac,* 867 F.2d 174, 178 (3d Cir. 1989); *United States v. Nixon,* 881 F.2d 1305, 1311–12 (5th Cir.1989); *United States v. Mazzanti,* 925 F.2d 1026, 1030 (7th Cir. 1991); *United States v. Tierney,* 947 F.2d 854, 862 n. 4 (8th Cir.1991).[26]

The Fourth Circuit has applied the *Larrison* test on only one occasion, and in so doing, explicitly limited its application to the particular facts of that case. *United States v. Wallace,* 528 F.2d 863, 866 (4th Cir.1976). The *Wallace* court noted that the witness who had perjured himself had supplied the only "proof of an essential element of the crime charged and reserve[d] for an appropriate case any decision as to what degree of certainty should be applied when the [perjured] testimony [is] only collateral, cumulative or corroborative." *Id.* at 866, n. 3. The appropriate case apparently has yet to arise and it is therefore unclear in this Circuit

what test should be applied to perjured testimony of which the government did not have cause to be aware.

■ Against this legal background, the court finds that the government should have known that Gerant was going to testify falsely, at least with respect to his cooperator testimony.[27] While the government repeatedly insists that it was not until Gerant's cross-examination that he first claimed to be an actual informant, the government fails to recognize that Gerant's direct testimony regarding his "vicarious cooperation" was in and of itself of a perjurious nature. As Judge Harvey of this court has previously recognized, Gerant, being a former Miami police officer, could not possibly believe that it was lawful to engage in drug transactions simply because a fellow participant was allegedly acting as a government informant. *Gerant* 775 F.Supp. at 188. Nor could Gerant have possibly believed that he could legitimately retain his narcotics earnings from those transactions simply by reporting them on his taxes. These assertions by Gerant, which he initially made to the government one week before trial, should have alerted the prosecution to the fact that Gerant was not being truthful with them. Indeed, the government's own case agent testified that he did not believe this assertion by Gerant and regarded it as a convenient excuse. However, instead of probing Gerant in any meaningful way on this issue, the government somewhat blithely accepted his plainly dubious assertions and then intentionally elicited them on his direct examination in an

---

*United States v. Nixon,* 881 F.2d 1305, 1311 (5th Cir.1989).

**26.** The *Larrison* "might" test appears to be the functional equivalent of the "any reasonable likelihood" standard discussed above. The Second Circuit, for example, has employed the two standards interchangeably. *Compare United States v. White,* 972 F.2d 16, 21 (2d Cir.1992) ("If the prosecution is charged with knowledge of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' (citation omitted)"), *cert. denied,* —— U.S. ——, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992); and *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992) ("It is only in the rare instance where it can be shown that the prosecution

knowingly used false testimony that we would permit a less stringent test and permit the granting of a new trial where the jury 'might' have acquitted absent the perjury."); *see also United States v. MMR Corp.,* 954 F.2d 1040, 1049 n. 7 (5th Cir.1992) ("Moreover, the district court applied for the sake of argument the 'any reasonable likelihood' standard which seems at least as broad as the *Larrison* rule.").

**27.** In so holding, the court does not mean to suggest that either the AUSA, the case agent, or any other government official, actually knew that Gerant would testify untruthfully. The court finds both the AUSA and the case agent to be impressively credible individuals and credits their testimony that they did not have actual knowledge that Gerant would testify falsely.

effort to bolster his credibility before the jury. In this connection, the prosecution team should have been especially wary of Gerant's credibility given the fact that he initially lied to them about his most recent involvement in narcotics trafficking.[28]

Further, even after recognizing that Gerant had in all likelihood committed perjury during his cross-examination, the government still failed to take effective remedial action. The prosecution advised the court, defense counsel, and the jury, not that Gerant had testified falsely, but only that the case agent had been unable to confirm Gerant's testimony with respect to two of the four agencies that Gerant had mentioned.

Whatever curative effect the case agent's testimony might have had, was then undercut by the government's closing argument. Despite his belief that Gerant had perjured himself, government counsel argued to the jury that, although Gerant may have made certain innocent mistakes, he was a credible witness with a track record of testifying truthfully. Moreover, government counsel argued that Gerant's agreement with the government provided him with powerful motivation to testify truthfully in the instant case. While these kinds of arguments as to a witness' credibility and motivation are ordinarily proper, they plainly are not, in a case such as this, where government counsel has strong reason to believe, and in fact did believe, that Gerant had perjured himself. *See United States v. Wallach*, 935 F.2d 445, 459 (2d Cir.1991).[29]

■■■ Government counsel also continued during closing argument to make use of Gerant's cooperator testimony. The AUSA reiterated Gerant's purported belief that 30 percent of his drug transactions were undertaken with the tacit consent of the United States Government. Accordingly, the government did not, as it now suggests, make clear to the jury that Gerant had testified untruthfully with respect to his cooperator testimony. To the contrary, the government strenuously sought to convince the jury that Gerant was an honest, credible witness in all respects.[30]

**28.** At the evidentiary hearing, the government repeatedly insisted that Gerant had not lied to the government concerning his last narcotics transaction, but only to his attorneys. This is disingenuous. Obviously, Gerant's attorney did not disclose this information to the government without first obtaining Gerant's authorization. In the court's view, there is no practical difference between Gerant lying directly to the government and his doing so via his attorney.

**29.** In *Wallach*, the Second Circuit held that a prosecutor's closing argument, similar to the one at issue here, provided "one more reason to set aside the jury's verdict" in a case involving perjured testimony. The argument in *Wallach* was as follows:

> The government submits to you that Mr. Marino and Mr. Guariglia are credible witnesses and you should credit their testimony for a number of reasons. First of all, they have confessed to their crimes, they have admitted their crimes, and they have pleaded guilty to serious felony counts. They entered into cooperation agreements with the government and those agreements are in evidence. . . .
>
> You heard the terms of those agreements when they testified. If they perjured themselves, if they give false testimony in this trial, then the deal is off. They can be prosecuted for every crime they committed and everything they have said in interviews with the U.S. Attorney's Office and every trial they have testified in, their testimony can be used against them. That I submit gives them a powerful motive to tell the truth when they testified at this trial.

935 F.2d at 459.

**30.** The government contends that its closing argument in this case was perfectly proper. In this regard, the government points out that the court instructed the jury that even if a witness is shown to have testified falsely, the jury may still credit the remainder of that witness' testimony. (ST 9505). This instruction, however, did not give the government license to erroneously indicate to the jury that Gerant had been a completely honest witness. Consistent with the court's charge, government counsel certainly could have argued to the jury that, although Gerant had testified falsely with respect to his cooperator testimony, the remainder of his testimony should nevertheless be credited. Instead, government counsel made various arguments as to why Gerant was a credible witness, without any acknowledgement that he, in fact, had testified falsely.

The court also finds without merit defendant's claim that government counsel improperly vouched for Gerant's credibility. Vouching occurs where an attorney expresses his personal opinion as to a witness' credibility. *See United States v. Moore*, 710 F.2d 157, 159 (4th Cir.), *cert. denied*, 464 U.S. 862, 104 S.Ct. 192, 78 L.Ed.2d 169 (1983). While government counsel offered several arguments as to Gerant's credibility, he did not state his personal belief.

■ Having found that the government should have known that Gerant would testify falsely, and that the prosecution did not remedy the perjury upon becoming aware of it, the court will now turn to the issue of whether there is any reasonable likelihood that Gerant's false testimony affected the judgment of the jury.[31] In the court's view, there is a considerable likelihood that Gerant's testimony had such an effect insofar as defendant's CCE conviction is concerned. Indeed, the court believes that absent Gerant's perjurious testimony, the jury probably would have acquitted defendant on that charge. Accordingly, even if the government did not have reason to know that Gerant would testify untruthfully, the court would still be constrained to vacate defendant's CCE conviction and order a new trial.

In order to establish defendant's guilt on the CCE charge, the government was obligated to prove, among other things, that defendant "organized, supervised or managed" five or more people. *See* 21 U.S.C. § 848; *United States v. Butler*, 885 F.2d 195, 200 (4th Cir.1989). The Fourth Circuit has made clear that these three terms are used disjunctively and that they should be "applied in their ordinary sense as understood by the public or the business community." *Butler*, 885 F.2d at 200.[32] The Fourth Circuit has also held "that the mere showing of a buyer-seller relationship including the 'fronting' of drugs, *i.e.*, selling drugs on credit, does not alone establish organization, su-

pervision or management for purposes of the CCE statute." *United States v. Shifflett*, 93-5693, 1995 WL 125506 (4th Cir. March 23, 1995) (*per curiam*); *United States v. Butler*, 885 F.2d at 200.

Gerant's perjurious testimony as to loads # 1 and # 2 constituted powerful evidence of defendant's supervision, organization and management. According to Gerant, it was defendant who provided all of the logistical planning for these massive importations, organized the various meetings and controlled all of the money and cocaine. On the basis of Gerant's testimony, the government asserted to the jury during closing argument that defendant had his own "cocaine organization" (ST 5672), and that defendant controlled at least nine individuals who were involved in loads # 1 and # 2. (ST 5724).[33] Government counsel, adopting Gerant's testimony, argued to the jury that it was defendant who was "in charge ... giving the instructions," conducting the meetings, purchasing airplanes, and paying Gerant (ST 5672–5678).

■ The government contends that even without Gerant's testimony on loads # 1 and # 2, there is sufficient independent evidence upon which defendant's CCE conviction can stand. In this regard, the government focuses upon the testimony of Marshall Jones and his customers, Watkins, Carnahan and Hamilton, concerning defendant's activities during Jones' year of incarceration.[34] The court does not agree with the government's assess-

---

**31.** In the court's view, the "any reasonable likelihood" test is applicable to all of Gerant's perjured testimony, even though the government did not have specific reason to question his testimony in regards to loads # 1 and # 2. Having called a plainly untruthful witness to testify, the government must bear the responsibility for all of that witness' perjured testimony, not just the particular portion which the government had strong reason to doubt. In this context, the responsibility is borne through the use of the less stringent "any reasonable likelihood" test. The government has not contested this point either at the hearing or in any of its submissions.

**32.** The term organizer for example has been defined "as a person who puts together a number of people engaged in separate activities and arranges them ... in one essentially orderly operation or enterprise." *Butler*, 885 F.2d at 201 (*quoting* 2 E. Devitt & C. Blackmar, *Federal Jury*

*Practice and Instructions*, § 58.21 (1977). In this regard, "while proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, such proof is not required to show that a defendant acted as an organizer." *Id.*

**33.** The government asserted that defendant controlled Gerant, John Kay, David Seeright, Allan Rudd, Anthony DeAntoni, Richard DeAntoni, Steven Sharp, Bill Spradley, and J.R. Rolle.

**34.** The government did, in its closing argument to the jury, argue that defendant supervised each of Jones' customers. In so doing, however, the government, without objection, erroneously suggested to the jury that defendant's "fronting" of narcotics was a sufficient basis upon which to find that defendant managed and supervised, not only Jones' customers, but their dealers/customers in turn. (ST 5723).

ment of this testimony. Despite their conclusory assertions as to defendant's "takeover" of Jones' business, Watkins, Carnahan and Hamilton, described little more, if at all, than a buyer-seller relationship with defendant.[35] Upon acquiring their cocaine from defendant, each was free to dilute, price and resell it as each saw fit. Defendant did not proscribe any territorial restrictions upon them and did not share in their profits. Nor did he organize or arrange them in any way. Relations such as these, even when viewed in the light most favorable to the government, have repeatedly been found insufficient to sustain CCE convictions. *See United States v. Shifflett, supra,* 1995 WL 125506 at 3 ("The remaining four people purchased drugs from [defendant], sometimes on credit, at the price that [defendant] demanded." [Defendant] acted towards these four, in ordinary business terms, as a wholesaler acts towards retailers.... [Defendant] "did not organize, supervise or manage these four."); *United States v. Ward,* 37 F.3d 243, 248 (6th Cir. 1994) ("... [U]nless [defendant] also instructed Hicks concerning to whom Hicks could sell or what prices he must charge— the act of fronting the drugs provides no evidence of the control required under § 848.").[36]

The government contends that defendant did exercise control over Jones' customers by "unilaterally changing the arrangements Jones had made for the delivery of cocaine."

Government's Answer at 33. Carnahan, however, upon whom the government relies for this assertion, testified that defendant "politely" indicated that he "would be glad to get the cocaine to our house" for a fee of $750 a kilo. (ST 891). A polite offer by a supplier to deliver his product to the purchaser's home hardly evidences the type of supervision, organization or control required by the CCE statute.

The government also points to the fact that Silvers "lowered the quality of the cocaine." Government's Answer at 34. The mere fact that a supplier exercises control over the quality of the product that he is supplying clearly does not indicate that he is exercising any type of supervisory control over the purchasers of that product. The evidence on this issue, in fact, cuts against the government's position. Because of his dissatisfaction with the quality of defendant's cocaine, Carnahan, on one occasion, purchased cocaine from an alternative source. If anything, this indicates a lack of control on defendant's part. *See United States v. Delgado,* 4 F.3d at 787 ("His customers were also free to shop, bargain and switch suppliers, and they did so.").

Finally, the government points to the fact that defendant insisted upon written receipts, and on some occasions that payment be made by check to one of his businesses. The fact

---

**35.** In so finding, the court is mindful of the Fourth Circuit's unpublished opinion affirming defendant's conviction. While neither party has raised the issue, the Fourth Circuit stated therein that "Raymond Carnahan, Charles Hamilton, and John Gerald Gerant testified that they were supervised by Steven Silvers." *United States v. Silvers,* No. 88–5560, slip op. at 5–6, 1989 WL 141660 (4th Cir. November 17, 1989). The Fourth Circuit, however, made this observation in denying defendant's challenge to the sufficiency of the government's evidence and, as such, the Fourth Circuit was viewing the evidence "in the light most favorable to the government." *Id.* at 6. The court has carefully reviewed the testimony of these witnesses and is unable to find any such direct statement regarding defendant's supervision. The Fourth Circuit, viewing the evidence in the light most favorable to the government, apparently inferred defendant's supervision from the testimony. In the present context, the standard of review employed is not nearly as deferential to the government. In this circum-

stance, the court's holding on this issue is not inconsistent with the Fourth Circuit's previous determination.

**36.** *See also United States v. Delgado,* 4 F.3d 780, 787 (9th Cir.1993), ("[Defendant] extended credit to his customers as many wholesalers do, but his customers could sell to whom they pleased, on whatever terms they chose, without any direction from him, so far as the evidence indicates. They were free to hire whom they chose ... and they did not share their profits with him." CCE conviction reversed); *United States v. Patrick,* 965 F.2d 1390, 1396 (6th Cir.) ("There is no evidence of anything beyond a buyer-seller relationship between [defendants] and Lawson. Neither [defendant] was involved in organizing Lawson's enterprise. They did not dictate Lawson's prices, customers or territory. Thus, neither [defendant] organized, managed or supervised Lawson or any of Lawson's underlings."), *cert. denied,* — U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992).

that defendant, in his position as a supplier, set such terms of payment is not indicative of supervision, organization or control. *See United States v. Shifflett*, 1995 WL 125506 at 3 ("And just as a wholesaler, who sells at prices he or she sets, on credit or for cash, does not organize, supervise or manage retailers, [defendant] did not organize, supervise or manage these four.").[37]

While the government has not raised the issue, the court also does not view defendant's various acts of money laundering as being significant evidence of supervision, management or control. Jones, Gerant, Watkins and Chaconas freely invested their drug earnings into defendant's businesses, after arm's length negotiations with him. There was no indication from any witness at trial that defendant applied any coercive pressures so as to obtain these investments. Plainly, the crime of money laundering is not co-extensive with CCE.[38]

In sum, absent Gerant's perjured testimony, the court finds that the jury probably would have acquitted defendant of the CCE charge. Accordingly, that conviction will be vacated and a new trial on that charge ordered.[39]

### C. *Defendant's Conspiracy Conviction*

[9] Although defendant has not suggested that Gerant's perjury affected his narcot-ics conspiracy conviction, the court has nevertheless considered the issue *sua sponte*. In the court's view, there is not a reasonable likelihood that Gerant's perjury had such an effect. While Gerant supplied important, indeed vital, evidence concerning defendant's supervision, management and control, the government presented an abundance of other evidence demonstrating defendant's participation in a narcotics conspiracy. The jury heard testimony from five other co-conspirators who were intimately involved with defendant in the conspiracy.[40] Moreover, the government introduced hundreds of inculpatory documents, including defendant's letter to Marshall Jones detailing his deliveries of cocaine to Jones' customers. The government also presented the signed receipts that defendant obtained in connection with those deliveries. Under these circumstances, the court must conclude that Gerant's perjury did not affect defendant's conspiracy conviction. *See United States v. Mazzanti*, 925 F.2d 1026, 1030 (7th Cir.1991) ("Moreover, there was sufficient independent evidence—indeed overwhelming evidence—of the existence of the conspiracy and of Mr. Mazzanti's participation in that conspiracy." New trial motion denied under the *Larrison* test.); *United States v. Taglia*, 922 F.2d 413, 416 (7th Cir.) ("[E]ven if the jury had given no weight whatsoever to Blessing's testimony, it

---

**37.** The court notes that the evidence presented at trial did clearly indicate that defendant supervised and managed his brother Gary. The defendant also on at least one occasion employed Darryl Hughes and Guy Varron as couriers. As discussed above, however, the CCE statute requires that five individuals be organized, supervised or managed. In this connection, the government mistakenly contends that defendant acknowledged at the evidentiary hearing that he used four other couriers while Jones was in prison. *See* Government's Answer to Defendant's Supplement at 42. Defendant indicated only that these four individuals had been used as couriers by Marshall Jones (EH 1298, 1390–91). In any event, defendant's testimony at the evidentiary hearing in this regard is plainly irrelevant to the issue of whether Gerant's perjurious testimony affected the jury's verdict. The government's contention that the court should factor into this analysis a variety of evidence that was not even placed before the jury, *see* Government's Answer to Defendant's Supplement at 39–45, is singularly unmeritorious.

**38.** The court also does not view defendant's involvement in the Jamaican marijuana importations as evidence of supervision, management or control. As discussed above, defendant's role in these importations was essentially to provide transportation via Gerant. It was Jones and Greenwald who purchased, selected and distributed the marijuana upon its importation. There was no evidence that defendant supervised, managed or organized anyone with respect to these ventures.

**39.** As set forth *supra*, defendant in a separate claim, has also asserted that Gerant's false testimony affected the sentence that the court imposed on his CCE conviction. The court agrees. Accordingly, had the court not vacated defendant's CCE conviction, it would instead have ordered that defendant be resentenced for that offense.

**40.** The five were Marshall Jones, Raymond Carnahan, Charles Hamilton, Donald Watkins and Todd Lovitt.

would have convicted the defendants. The crucial evidence against them was not Blessing's testimony but the tapes." Motion for new trial denied under the *Larrison* test), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991).

Because conspiracy is a lesser included offense of CCE, the court, pursuant to the law of this Circuit, vacated defendant's narcotics conspiracy conviction at the time of his sentencing. *See United States v. Butler*, 885 F.2d 195, 202 (4th Cir.1989) ("A defendant convicted under [the CCE statute] Section 848 may not also be convicted for any predicate conspiracy charges proved as elements of the second 848 offense."); *United States v. Raimondo*, 721 F.2d 476, 477 (4th Cir.1983) ("As the government properly concedes, the distribution and conspiracy charges in this case are lesser included offenses of the continuing criminal enterprise charge (citation omitted). We therefore vacate [defendant's] conviction for distributing and conspiring to distribute cocaine under 21 U.S.C. §§ 841(a)(1) and 846."), *cert. denied*, 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984).[41]

█ The issue which the court now faces is whether defendant's lesser included conspiracy conviction may be reinstated now that the greater offense, CCE, no longer exists. This question appears to be a matter of first impression in this Circuit.

As far as the court is aware, the only Circuit that has been squarely confronted with this issue is the Sixth. In *United States v. Ward*, 37 F.3d 243, 250 (6th Cir.1994), the defendant was convicted of both conspiracy and CCE. Following the jury's verdict, the district court vacated the conspiracy conviction as a lesser included offense of CCE. The Sixth Circuit found that the evidence was insufficient for the jury to conclude that Ward had managed, supervised or organized five or more people. *Id.* at 250. The Sixth Circuit, however, did not find any error with respect to his conspiracy conviction. Accordingly, upon vacating Ward's conviction for CCE, the Sixth Circuit, without any discussion, "reinstated" his conspiracy conviction. *Id.* at 250.[42]

In addition to the Sixth Circuit's decision in *Ward*, it has been recognized by the Supreme Court, in another context, that a vacated conviction may lawfully be reinstated. In *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Supreme Court held that a conviction may be reimposed where the trial court erroneously grants a judgment of acquittal notwithstanding the jury's verdict of guilty. In so holding, the Supreme Court recognized that reinstatement of a conviction does not implicate the Double Jeopardy Clause of the Fifth Amendment since it does not result in either a second prosecution or multiple punishments. *Id.* at 345, 95 S.Ct. at 1022.[43] *See also United States v. Jones*, 763 F.2d 518, 525 (2d Cir.), ("The reinstatement of [the jury's] ... verdict does not violate Jones' double jeopardy rights since he will not be subjected to a second trial for the same offense. When a guilty verdict is reinstated, double jeopardy is not implicated."), *cert. denied*, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985); *Govt. of the Virgin Islands v. Josiah*, 641 F.2d 1103, 1108 3d Cir.1981) ("The Double Jeopardy Clause is not offend-

---

**41.** The rationale for vacating a lesser included conviction as opposed to simply imposing a concurrent sentence on that offense, is that a defendant might suffer "collateral consequences" as a result of having convictions on both the greater and lesser offenses. *See Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985) ("The separate conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction ... certainly carries the societal stigma accompanying any criminal conviction. (citation omit-

ted). Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.")

**42.** The appellant in *Ward* conceded that the reinstatement of his conspiracy conviction was appropriate. 37 F.3d at 250.

**43.** The Double Jeopardy Clause safeguards an individual against (1) a second prosecution for the same offense, following an acquittal; (2) a second prosecution for the same offense, following a conviction; and (3) multiple punishments for the same offense. *Wilson*, 420 U.S. at 332, 95 S.Ct. at 1016.

ed when the government appeals a post-verdict judgment of acquittal if reversal on appeal would merely reinstate the jury verdict.... This is so because the defendant 'will not twice be tried and thus will not twice be put in jeopardy for the same offense.' ") (*quoting United States v. Schoenhut,* 576 F.2d 1010, 1018 n. 7 (3d Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978)).

While *Wilson* and the cases following it plainly involve a factual scenario distinct from the case at bar, the court nevertheless believes that the Supreme Court's holding, and the reasoning underlying it, are fully applicable here. If an appellate court may properly reinstate a conviction on direct appeal, there is no reason why a district court should not be able to do likewise on collateral review.[44] *See United States v. Maddox,* 944 F.2d 1223, 1233 (6th Cir.) ("Thus there is no question that we could reverse and order that the conviction be reinstated. It follows *a fortiori* that it would not violate double jeopardy principles for the district court to make the same determination after a timely motion for reconsideration."), *cert. denied,* 502 U.S. 950, 112 S.Ct. 400, 116 L.Ed.2d 349 (1991); *North Carolina v. Pearce,* 395 U.S. 711, 720, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656 (1969) ("That a defendant's conviction is overturned on collateral rather than direct attack is irrelevant for these purposes [of double jeopardy] ... "); *Hardwick v. Doolittle,* 558 F.2d 292, 297 (5th Cir.1977) ("When a conviction is overturned on direct appeal *or on collateral attack,* the double jeopardy clause does not bar retrial.... ") (emphasis added), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978).

That a vacated conviction may legitimately be reinstated has also been recognized by several Circuits in another context as well. In *United States v. Hooper,* 432 F.2d 604 (D.C.Cir.1970), the appellant challenged two bank robbery convictions for which he had been given concurrent sentences. Finding no error warranting reversals of one of the convictions, the D.C. Circuit elected, in the interest of judicial economy, to simply vacate the other conviction, rather than engaging in a lengthy and needless analysis of the legal challenge raised by appellant with respect to that conviction. In so holding, the court noted:

> The vacation of the judgment does not destroy the jury verdict, but is rather equivalent in practical effect to a suspension of the imposition of sentence. If it later develops that the interest of justice so requires, the sentence can be reimposed on a concurrent basis. The conviction could then be subject to appellate review.

432 F.2d at 606 n. 8.

The D.C. Circuit has continued to follow the approach set forth in *Hooper. See United States v. Wood,* 879 F.2d 927, 938 (D.C.Cir.1989). The Fifth and Eleventh Circuits have adopted this doctrine as well, and in so doing, have explicitly recognized that a vacated conviction may be reimposed in the interests of justice. *See United States v. Cardona,* 650 F.2d 54, 58 (5th Cir.1981) ("We deem the *Hooper* approach to be appropriate in this case. Accordingly, we vacate the convictions of [the appellants] on count III. If the government subsequently determines that the interests of justice require reimposition of the sentences, then it may interpose its objections and these vacated convictions would then be open to appellate review."); *United States v. Butera,* 677 F.2d 1376, 1386 (11th Cir.1982) ("The [*Hooper*] procedure is appropriate here.... [I]f the government subsequently determines that the interests of justice require reimposition of the sentence, it may renew its response to Denoma's challenge and the conviction in count one would be open to full appellate review."), *cert. de-*

---

**44.** This is especially true where, as here, defendant has effectively raised this issue for the first time by bringing a successful challenge to his CCE conviction. In this regard, defendant can have no legitimate expectation of finality with respect to the court's vacation of his conspiracy conviction when he has challenged the greater offense upon which that vacation was solely

based. *Cf., United States v. Shue,* 825 F.2d 1111, 1115 (7th Cir.1987) ("Where the defendant challenges one of several interdependent sentences (or underlying convictions) he has, in effect, challenged the entire sentencing plan ... [and] he can have no legitimate expectation of finality in any discrete portion of the sentencing package after a partially successful appeal.").

*nied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).[45]

The court is unaware of any case in which the reinstatement of a previously vacated conviction has been found improper. The Second, Third and Ninth Circuits, however, apparently concerned that reinstatement is not permissible, have instructed district courts not to vacate lesser included conspiracy convictions. *See United States v. Osorio Estrada,* 751 F.2d 128, 135 (2d Cir.1984), *cert. denied,* 474 U.S. 830, 106 S.Ct. 97, 88 L.Ed.2d 79 (1985); *United States v. Grayson,* 795 F.2d 278, 287 (3d Cir.1986), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 505 (1987); *United States v. Medina,* 940 F.2d 1247, 1251 (9th Cir.1991). In so directing, the Second and Ninth Circuits, without providing any rationale, have expressed the view that a vacated conviction cannot be reimposed. *Osorio Estrada,* 751 F.2d at 134; *Medina,* 940 F.2d at 1253.[46] Instead of vacating a lesser included offense, the Second Circuit's practice is to "combine" the lesser conviction with the greater offense. *Osorio Estrada,* 751 F.2d at 135.[47] The Third Circuit's practice is to impose a "general" sentence on all counts for a term not exceeding the maximum possible sentence on that count which carries the greatest maximum sentence." *United States v. Corson,* 449 F.2d

544, 551 (3d Cir.1971) (*en banc*). The Ninth Circuit, on the other hand, "sentences in the alternative based upon the lesser included count, or counts," with the alternative sentence being "conditioned upon an appellate reversal of the CCE count." *Medina,* 940 F.2d at 1253.

The majority of the Circuits, including the Fourth, have not resorted to such legal legerdemain as "combined" convictions or conditional "alternative" sentences. In cases where district courts have failed to vacate lesser included conspiracy convictions at the time of sentencing, the majority's practice has simply been to remand with instructions to vacate. *See United States v. Rivera–Martinez,* 931 F.2d 148, 153 (1st Cir.), *cert. denied,* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991); *United States v. Johnson,* 54 F.3d 1150 (4th Cir.1995);[48] *United States v. Schuster,* 769 F.2d 337, 345 (6th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986); *United States v. Maull,* 806 F.2d 1340, 1346–47 (8th Cir.), *cert. denied,* 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987); *United States v. Jones,* 918 F.2d 909, 911 (11th Cir.1990); *United States v. Stallings,* 810 F.2d 973, 975–76 (10th Cir.1987); *United States v. Smith,* 703 F.2d 627, 628 (D.C.Cir.1983) (*per curiam*).[49] In so holding, none of these Cir-

**45.** The Ninth and Tenth Circuits have considered the *Hooper* doctrine, but ultimately declined to adopt it. *See United States v. De Bright,* 730 F.2d 1255, 1257 (9th Cir.1984); *United States v. Montoya,* 676 F.2d 428, 432–33 (10th Cir.), *cert. denied,* 459 U.S. 856, 103 S.Ct. 124, 74 L.Ed.2d 108 (1982). In so doing, however, neither Circuit questioned the basis of the doctrine—that a vacated conviction may properly be reimposed if the interests of justice require.

**46.** The comments by the Second and Ninth Circuits in this regard are plainly *dicta* since the CCE convictions in those cases were affirmed. Neither Circuit has ever actually found the reinstatement of a conviction to be improper.

**47.** The concurring judge in *Osorio Estrada* candidly recognized that she did know what it "means otologically" to "combine" convictions. 751 F.2d at 135. In the view of the concurring judge, it would have been preferable to simply vacate the convictions on the lesser included offenses, with the understanding that those offenses "would be reinstated in the event that the conviction on the greater offense ... were ever overturned for reasons not affecting the validity

of the [lesser included] convictions...." *Id.* The concurrence recognized that this had been the prior practice of the Second Circuit. *Id.*

**48.** The Fourth Circuit was not always consistent on this issue as in some cases it directed that only the conspiracy sentence be vacated and not the conviction itself. *See United States v. Murphy,* 91–5426, 1993 WL 130202 (4th Cir. April 27, 1993) (compiling cases). In *Murphy,* however, the Fourth Circuit recognized that a "substantial majority of the Circuits ... have concluded that the proper approach is to vacate both the convictions and sentences for any predicate conspiracy convictions." *Id.* at 8. Finding the majority approach "persuasive" in light of the Supreme Court's decision in *Ball, see supra* at n. 41, the Fourth Circuit issued a remand in *Murphy* with instructions to vacate the appellant's conspiracy conviction. *Id.*

**49.** The Fifth Circuit, standing alone, has held that "predicate offenses of a continuing criminal enterprise violation are not lesser included offenses of the continuing criminal enterprise...." *United States v. Guthrie,* 789 F.2d 356, 360 (5th

cuits have expressed concern that the greater offense might one day be overturned pursuant to a § 2255 motion, thereby permitting the defendant to escape all punishment.

Having considered the above authorities, the court is of the view that defendant's conviction may be reimposed. As the Fourth Circuit has recognized, vacating a lesser included offense is "nothing more than a technicality" that is done purely for the defendant's benefit so as to insure that he is not punished, either directly or collaterally, for both the lesser and greater offense. *United States v. Reavis*, 48 F.3d 763, 773 (4th Cir. 1995). The vacation of the defendant's conviction was not a rejection of the jury's verdict, but rather was equivalent in practical effect to a "suspension of the imposition of sentence." *United States v. Hooper*, 432 F.2d at 606 n. 4. Now that defendant's CCE conviction has been reversed, there is no justification for defendant to escape punishment for his major role in a far-reaching conspiracy for which he was properly convicted. To hold otherwise, would indeed be to exalt form over substance. Accordingly, defendant's conspiracy conviction will be reinstated and a hearing held for sentencing on that conviction.[50]

*The Discovery Issue*

Defendant asserts that the government violated its discovery obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to immediately notify him when information, contrary to Gerant's testimony, was obtained from Rudd and Pesantes. As discussed above, Rudd and Pesantes were initially interviewed by the case agent in May of 1988 and June of 1989 respectively. Defendant was first provided with reports of these interviews in June of 1990. In response to this claim, the government asserts that earlier

disclosure of this information to the defendant would have jeopardized the government's ongoing investigations.

Generally, the government must disclose *Brady* material in sufficient time that it may be effectively used at trial. *See United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir.1988). According to the parties, there have been no cases which have addressed the timeliness of the government's disclosure where the evidence in question was discovered post-trial. To the extent, however, that earlier disclosure in this case was warranted, the defendant plainly has not been prejudiced. As the government points out, even after receiving the interview reports, defendant waited nearly two years to file a new trial motion, preferring to wait and see the outcome of the government's investigation and prosecution of Gerant. In fact, defendant did not file his new trial motion until nearly eight months after Judge Harvey's finding that Gerant had committed perjury.

Defendant also asserts that the government failed to reveal various materials to him prior to trial. *See* Defendant's Motion at 26–30. Defendant has failed, however, to demonstrate that any of this material was either discoverable or that it would have had any impact upon the trial. Accordingly, defendant's claim under *Brady* will be denied.

*Conclusion*

For all of the foregoing reasons, defendant's CCE conviction is hereby vacated and his conspiracy conviction reinstated. A sentencing hearing on the conspiracy conviction will be held on Friday, June 30, 1995, at 2 p.m.

SO ORDERED.

---

Cir.1986). Prior to its decision in *Guthrie*, the Fifth Circuit's practice was to vacate predicate conspiracy convictions. *See United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985).

The Seventh Circuit, also standing alone, has held that it is permissible to "impose concurrent sentences for a conspiracy and the CCE offense." *United States v. Bond*, 847 F.2d 1233, 1238–39 (7th Cir.1988).

**50.** The court requested that counsel for the parties research and brief the issue of reinstatement. Both counsel later advised the court that the Ninth Circuit's decision in *Medina* was the only case on point and that reinstatement was therefore impermissible. The court specifically finds that the performance of counsel on this matter was seriously wanting.