**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Malik WARD, Defendant–Appellant.**

**No. 93–2258.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 5, 1994.

Decided Sept. 19, 1994.

Rehearing and Rehearing En Banc
Denied Nov. 8, 1994.

Stephen J. Murphy, III (argued and briefed), Office of the U.S. Atty., Detroit, MI, for plaintiff-appellee.

Margaret Raben (argued and briefed), Dise & Gurewitz, Detroit, MI, for defendant-appellant.

Malik Ward, pro se.

Before LIVELY, MARTIN, and SUHRHEINRICH, Circuit Judges.

LIVELY, Circuit Judge.

Malik Ward appeals his conviction and thirty-year prison sentence for multiple violations of narcotics laws. The indictment charged ten people with participating in an extensive drug operation in Detroit, but only Ward and Cherisse Thomas, his "girlfriend," pled not guilty and went to trial. Following a three-week trial, the jury acquitted Cherisse Thomas on all counts and found Ward guilty on eight counts while acquitting him on three.

Ward raises four issues on appeal. First, he contends the district court erred by denying his motion to suppress evidence seized during a search of Ward's apartment. Ward argues that the affidavit of a government agent, upon which a search warrant for the apartment was issued, failed to establish

probable cause for a search and was based on "stale" information.

Second, Ward seeks reversal for the prosecutor's alleged violation of his Fifth Amendment right not to be compelled to testify against himself. He argues that a government witness improperly testified concerning his failure to respond to an officer's questions during a search of a suspected drug house and that the prosecutor improperly commented on his failure to testify at trial.

Third, Ward argues that the evidence was insufficient to support his conviction for aiding and abetting the distribution of cocaine on July 31, 1992.

Finally, Ward contends that the evidence was insufficient to support his conviction for engaging in a continuing criminal enterprise (the CCE charge).

We find no merit in Ward's first three arguments and have determined that they require only the application of settled legal principles to the facts. Thus, we are issuing an unpublished appendix with this opinion affirming the district court's rulings on those issues.

## I.

■ The majority of the evidence in this case came from the testimony of a defendant, Sadie Ramnares, who pled guilty to several charges.

According to Ramnares, she met defendant Ronald Hicks in 1989 and subsequently agreed to help him sell drugs. Hicks lived on Braile Street but sold drugs from a house on Blackstone Avenue, which he rented with Malik Ward. Ward lived at Hidden Pines Apartments on Telegraph Avenue, but usually was present at the Blackstone house when Ramnares accompanied Hicks there. Ward's cousins, Mark and Edroy Dickens, also sold drugs at the Blackstone house.

Ramnares testified that Ward regularly "fronted" cocaine to Hicks. In other words, Ward would give cocaine to Hicks, but would allow Hicks to delay payment for the drugs until Hicks had sold them. Ramnares testified that on several occasions, she accompanied Hicks to Ward's apartment on Tele-

graph to purchase drugs. Ramnares stated that Hicks had to account to Ward for the proceeds from his drug sales and that Hicks was afraid of Ward.

There was also evidence of specific transactions involving Ward.

On September 18, 1991, a defendant, Paris Strozier, purchased 12 ounces of cocaine from Ward at the Blackstone house; Strozier immediately resold the drugs to Michael Farley, an undercover officer. According to Farley's testimony, the drugs were delivered to the Blackstone location by two black males in a 1991 gray Volvo. Surveillance officers followed the Volvo from the scene, and the car subsequently stopped at Ronald Hicks's house on Braile. The officers secured the scene and detained everyone present, including Malik Ward. When the officers obtained a warrant and searched the premises, they found Ward in possession of the keys to the Volvo.

In 1992, Agent Michael Yott of the Bureau of Alcohol, Tobacco and Firearms (ATF) began investigating a rumored drug conspiracy. Through an informant, known as "ATF–1," and later on his own, Yott arranged several undercover purchases from Hicks. According to ATF–1, the cocaine purchased from Hicks was obtained from a man called "Malik," who lived on Telegraph Avenue—the apartment building where Malik Ward lived. During the week of July 20, 1992, ATF–1 arranged a drug purchase from Ronald Hicks. Hicks took ATF–1 to the Hidden Pines apartment building—Ward's apartment building—to pick up the drugs from "Malik."

On July 31, 1992, Yott arranged to purchase some cocaine from Hicks. Yott met Hicks at the prescribed location. After Hicks arrived in one car, Ward appeared driving Hicks's car. After Yott had given Hicks the money for the cocaine, Hicks left Yott's car and briefly got into the car with Ward. Although Ward and Hicks left the scene separately, surveillance officers observed them meeting shortly thereafter at a service station near the transaction site. On August 18, 1992, Yott applied for a warrant to search Ward's and Thomas's jointly-rented residence at Hidden Pines Apartments on

Telegraph Avenue. During that search, drugs, firearms and other drug paraphernalia were recovered.

## II.

Ward contends that the government failed to prove all the elements required for conviction as a participant in a continuing criminal enterprise. We begin by noting that Hicks did not make a motion for acquittal at the close of the government's case or at the conclusion of all the evidence. Fed. R.Crim.P. 29. Failure to make or renew a motion for acquittal constitutes a waiver of the right to contest sufficiency of the evidence on appeal in the absence of a "manifest miscarriage of justice." *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993).

### A.

The government must prove five statutory elements under 21 U.S.C. § 848 to sustain a CCE conviction. These elements are:

1) a felony violation of a federal narcotics law;
2) as part of a "continuing series of violations;"
3) "in concert with five or more persons;"
4) for whom defendant is an organizer or supervisor; and
5) from which he derives substantial income.

*United States v. English*, 925 F.2d 154 (6th Cir.) (quoting 21 U.S.C. § 848), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991). Ward contends that the government did not present sufficient evidence that he was an organizer or supervisor of five persons.

The relationship requirement under § 848 is flexible. The defendant need not have the same type of relationship with each individual, and the relationships need not exist at the same time. *United States v. Davis*, 809 F.2d 1194, 1204 (6th Cir.) (citing *United States v. Sinito*, 723 F.2d 1250, 1261 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984)), *cert. denied*,

483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987). However, as this court noted in *English*, although the relationship between an organizer and his subordinates may be "somewhat loose ... simply purchasing cocaine from the 'organizer' standing alone is not enough to satisfy the relationship requirement." 925 F.2d at 157. See also *United States v. Jenkins*, 904 F.2d 549, 553 (10th Cir.), (buyer-seller relationship does not establish organizer or supervisor status), *cert. denied*, 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990).

"[T]he terms organizer, supervisor, or manager are to be given their ordinary meaning." *United States v. Moya–Gomez*, 860 F.2d 706, 746 (7th Cir.1988) (citing *United States v. Wilkinson*, 754 F.2d 1427, 1431 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985)), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). The defendant may satisfy this requirement "by setting the prices of the drugs [and] ... by forcing his customers to pay promptly...." *English*, 925 F.2d at 157 (citing *United States v. Jones*, 801 F.2d 304, 308–09 (8th Cir.1986)). Furthermore, a person can be "found to be under the defendant's organization or supervision because she knew· about the drug operation, took orders directly from the defendant and helped in the drug business." *Id.* A broker or courier under the defendant's supervision, someone who stores drugs for the defendant, or one who collects or launders drug proceeds is also within the ambit of the statute. *United States v. Phibbs*, 999 F.2d 1053, 1082–85 (6th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994); *United States v. Chalkias*, 971 F.2d 1206, 1214 (6th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 265 (1992); *United States v. Jenkins*, 904 F.2d 549, 554 (10th Cir.), *cert. denied*, 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990).

### B.

The prosecution theorized that Ward was an upper-level member of a multi-level drug operation. As a result of his position, the government argued, Ward was in command of at least five others. Since Ward's alleged

relationship with the supervisees varied, however, it is necessary to examine each alliance separately.

### (1) Ronald Hicks

■ There is extensive evidence of a relationship between Ward and Hicks. Ramnares testified that Ward would "front" cocaine to Hicks. Ramnares testified that Ward and Hicks argued whenever Hicks was "short," and that Ramnares and Hicks were afraid of Ward. Citing this testimony, the government points out that the use of force or coercion to collect drug proceeds is strong evidence of control. *United States v. Jones,* 801 F.2d 304, 308–09 (8th Cir.1986). However, that aspect of *Jones* is easily distinguished from the present case. In *Jones,* there was evidence that the defendant had threatened his "customers" and had brutally beaten one man who was late with his payment. In this case, there was no testimony from Ramnares that Ward ever threatened or harmed Ramnares or Hicks; she simply said that they were "afraid" that Ward "might do something to us."

■ We agree with the Court of Appeals for the Eighth Circuit that "the mere 'fronting' of cocaine alone is insufficient to support finding a management relationship...." *United States v. Possick,* 849 F.2d 332, 336 (8th Cir.1988) (citing *Jones,* 801 F.2d at 308 (8th Cir.1986)). Fronting cocaine, without additional elements of control, is nothing more than a variation on the traditional buyer-seller relationship. Therefore, unless Ward had some additional involvement with Hicks—i.e. unless Ward also instructed Hicks concerning to whom Hicks could sell or what prices he must charge—the act of fronting the drugs provides no evidence of the control required under § 848. The government provided no evidence that Ward set prices or arranged drug transactions. There is also no evidence that Hicks was acting as a broker for Ward.

As noted earlier, Ramnares testified that Hicks and Ward rented a house together on Blackstone Avenue. No one lived in the house, but Ward, Hicks and the Dickens brothers each sold drugs there. However, Ramnares did not claim that Hicks was act-

ing at Ward's instruction; if anything, her testimony indicates that Ward and Hicks were acting as partners in this transaction. Thus, we find no evidence from which the jury could reasonably infer that Ward was "supervising" or "organizing" Ronald Hicks.

### (2) Sadie Ramnares

■ Ramnares was the primary source of prosecution evidence in this case. She agreed to testify at Ward's trial as part of her plea agreement. Nevertheless, in nearly three hundred pages of testimony, Ramnares refers to only one instance in which she took any action at Malik's direction. In August 1991, at Ward's request, Ramnares rented a Volvo from a Hertz rental agency and gave it to Malik. According to Ramnares, Malik wanted the car so that he and Cherisse Thomas, along with Ramnares and Hicks, could go to "Cedar Point." The record does not give any indication as to the purpose of the trip to Cedar Point, i.e. whether Ward had arranged a drug transaction or the trip was purely recreational. There is no evidence that any drug transactions took place at Cedar Point.

There is ample evidence, however, that the Volvo rented by Ramnares was the same car used in the drug transaction of September 18, 1991, involving Paris Strozier. After police followed the Volvo to Hicks's Braile Street address, Ward was found to be in possession of the keys. Rental documents for the car bore Ramnares's name.

■ While innocent participants in a criminal activity cannot be counted as part of a continuing criminal enterprise, *United States v. Smith,* 24 F.3d 1230, 1234 (10th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 270, 130 L.Ed.2d 188 (1994), Ramnares was acting in concert with Ward if she knew he was using the car to deliver drugs. Thus, if the jury failed to believe Ramnares when she testified that she only rented the car for Ward to take it to Cedar Point, then the jury reasonably may have found that Ramnares rented the car for Ward to use in the 1991 drug transaction, and therefore Ramnares was under the control of Ward. While this period of control may have been quite brief,

there is nothing in the statute or prior case law to indicate any necessary minimum duration to qualify as a supervisee under § 848.

### (3) Paris Strozier

Paris Strozier was convicted on multiple drug charges following his September 1991 arrest. At trial, he testified that he purchased cocaine from Ward on at least three different occasions. In its closing argument, the government contended that Strozier was within Ward's control because Strozier "compl[ied] with the defendant's directions, going to Blackstone as he direct[ed]." Strozier may have complied with Ward's directions to go to the Blackstone house; however, those directions were nothing more than instructions concerning where to meet for the drug purchase. As we have previously noted, such a buying-selling relationship is insufficient to establish control under § 848. There is no evidence to support the government's contention that Ward paid Strozier for carrying out the deals with the undercover officer Farley. Rather, the record reveals that Strozier paid Ward "the regular price" for the drugs, sold them to Farley for more money and kept the difference. The evidence indicates only that Strozier and Ward had a buyer-seller relationship and that Strozier was not controlled or supervised by Ward.

### (4) Mark and Edroy Dickens

Ramnares testified that Mark and Edroy Dickens "worked" at the house on Blackstone that was rented by Hicks and Ward. However, Ramnares did not testify that the Dickens took any actions at the direction of Ward. Ramnares first stated that Edroy Dickens "worked for Ron [Hicks]." Ramnares further testified that the Dickens would cut cocaine rocks for sale. When Hicks sold the rocks for $20 each, the brothers would receive $5, and Hicks would keep the remaining $15. There was no evidence that Ward ever received any money from the rocks cut by the Dickens. There is some evidence, however, that the Dickens brothers were acting on behalf of Ward on the night of September 18, 1991. Paris Strozier testified that when he purchased cocaine from Ward on that date, Ward took him inside the Blackstone house where two men were sitting with guns. Strozier could not identify the men, but testified that one was holding a Tech–9 and the other a .44 Bulldog.

After the transaction between Strozier and undercover agent Farley was observed, Wayne County Narcotics Unit officers obtained a warrant and searched the Blackstone residence. One of the officers present testified that he found a "Bulldog 44 Special" on the sofa next to Edroy Dickens and a "9–millimeter Interarms handgun" next to Mark Dickens. Based on this evidence, it was reasonable for the jury to infer that Edroy and Mark Dickens were the men described by Strozier. Furthermore, the actions of these two men could reasonably have been interpreted as "enforcing" the transaction for Ward. Consequently, the jury could have counted Mark and Edroy Dickens as two of Ward's supervisees.

### (5) Cherisse Thomas

There is profuse testimony from Ramnares concerning the activities of Cherisse Thomas. According to Ramnares, Thomas would sell drugs for Ward at the Telegraph residence when Ward was not at home. These actions would clearly be sufficient to satisfy the "control" requirement of § 848; however, Thomas was acquitted of all charges, including conspiracy to distribute cocaine under 21 U.S.C. § 846. We have held that a co-defendant may not be included as one of the "supervisees" if she has been acquitted of conspiracy. *United States v. Patrick,* 965 F.2d 1390 (6th Cir.1992), *vacated and remanded on other grounds sub. nom. Mohwish v. United States,* —— U.S. ——, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993). This is so because § 848 requires that the defendant act "in concert" with five or more others, and therefore there must be an agreement between the controlling party and the controlled person. *United States v. Jeffers,* 432 U.S. 137, 148–50, 97 S.Ct. 2207, 2214–16, 53 L.Ed.2d 168 (1977) ("[Section] 848 does require proof of an agreement among the persons involved in the continuing criminal enterprise."); *United States v. Sinito,* 723 F.2d at 1261.

Cherisse Thomas occupied a role similar to that of a co-defendant in *Patrick.* In *Patrick* we held that one identified by the government as a supervisee who was acquitted on a

conspiracy charge could not have acted "in concert" with the defendants charged with CCE violations. 965 F.2d at 1396. Thus, under the settled law of this circuit, Cherisse Thomas may not be counted.

### III.

■ Based on the direct relationship between Ward and the alleged supervisees, there are, at most, three persons whom the jury might reasonably have counted in the controlled group: Sadie Ramnares and the Dickens brothers. Even if we were permitted to count Cherisse Thomas, the total number in the controlled group would be only four. The government seeks to reach the required number by arguing that Ward may be considered to have been in "indirect" control of those persons supervised by Ronald Hicks. Hicks pled guilty to the CCE charge and Ward concedes in his brief that Hicks controlled at least five persons.

### A.

■ At least two other circuits have found that "indirect" control is sufficient to fall within the language of § 848.

> If a defendant personally hires only the foreman, that defendant is still responsible for organizing the individuals hired by the foreman to work as the crew.... [M]ere delegation of authority does not detract from [the defendant's] ultimate status as organizer.

*United States v. Rosenthal,* 793 F.2d 1214, 1226 (11th Cir.), *modified on other grounds,* 801 F.2d 378 (11th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). See also *United States v. Alvarez,* 860 F.2d 801, 816 (7th Cir.1988) (quoting *Rosenthal*). According to the government's brief, "[Ward], as supervisor of Hicks, therefore assumes liability for the activity that Hicks organized."

The facts of this case do not support the government's argument. Even if, contrary to our finding, Hicks were under the control of Ward, and if Hicks did supervise at least five persons, there must be additional proof that the work done by these underlings for Hicks was the same work that Hicks was doing for Ward. In other words, if some of these supervisees were working on a different project for Hicks—a project not further-

ing the interests of Ward—then they were not indirectly controlled by Ward. See *Alvarez,* 860 F.2d at 816–17.

More importantly, there is simply no proof that Hicks was a "foreman" for Ward. While Hicks may have been in partnership with Ward, there is insufficient evidence to prove that Hicks was under Ward's control. The persons controlled by Hicks cannot automatically be attributed to Ward. While it is clear that a supervisor or organizer need not have personal contact with all of the persons organized, there must be some evidence that these supervisees were involved with Ward, and the government has failed to provide that evidence. *United States v. Butler,* 885 F.2d 195, 200–01 (4th Cir.1989); *United States v. Alvarez,* 860 F.2d 801, 833 (7th Cir.1988); *United States v. Becton,* 751 F.2d 250, 255 (8th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *United States v. Dickey,* 736 F.2d 571, 587 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

### B.

■ The government relies on *United States v. Adamo,* 742 F.2d 927 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). In that case, the defendant Marsico, a middleman supplier in a complex drug organization, and the defendant Linkous, one of Marsico's distributors, were convicted under § 848. This court upheld those convictions, finding that Linkous was in direct control of at least five other distributors and bookkeepers, and that Marsico, as supplier to Linkous, was consequently in control of those persons as well. *Id.* at 933–34. If nothing more than the relationship between Ward and Hicks is considered, *Adamo* appears to support the government's position. Of critical importance, however, is the fact that the government proved many other facts about the organization's activities in *Adamo* that it failed to prove in the present case. Marsico's role in *Adamo* reflected control of the distribution of drugs beyond Linkous, whereas the evidence here shows only that Ward supplied drugs to Hicks, who sold them to any buyers he could find, not to buyers determined or identified by Ward. The government did not prove that Ward either organized, supervised or controlled

five or more persons. Given the mandatory minimum sentence prescribed for a CCE conviction (20 years), it would constitute a "manifest miscarriage of justice" to permit this conviction to stand.

### IV.

 The district court properly merged the conspiracy count with the CCE count following the verdict, *United States v. Davis*, 809 F.2d at 1205–06, and vacated the conspiracy conviction. The defendant conceded at oral argument that the conspiracy conviction should be reinstated if we reversed the CCE conviction.

### CONCLUSION

We **REVERSE** the CCE conviction and vacate the sentence. The case is **REMANDED** to the district court with directions to dismiss the CCE. count and resentence the defendant in accordance with this opinion.