91 F.3d 145
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gordon SEXTON, Defendant-Appellant.
 No. 95-5760.
 United States Court of Appeals, Sixth Circuit.
 June 28, 1996.
 
 Before: KENNEDY, JONES, and CONTIE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-appellant, Gordon Sexton, appeals his sentence following a guilty plea of conspiring to distribute and possessing with intent to distribute marijuana. For the following reasons, we affirm.
 
 I.
 
 2
 From March through December, 1993, Special Agent Gilleland of the Tennessee Bureau of Investigation conducted an undercover operation targeting a conspiracy to distribute marijuana in Cocke County, Tennessee. During the course of the investigation, the agent purchased marijuana on at least 30 different occasions from 14 individuals. In addition, the agent purchased marijuana directly from defendant Sexton on two occasions in September 1993.
 
 
 3
 The main transporter of the marijuana was codefendant Jenkins, who used trucks from Black Mountain Motor Lines and trailers in order to transport marijuana from Texas to Tennessee. The marijuana was purchased in Edinburg, Texas from codefendants Juan and Gilbert Sepulveda, the source of supply. The primary driver of the trucks and trailers was codefendant James Holt.
 
 
 4
 In November 1993, Agent Gilleland traveled to Edinburg, Texas to obtain marijuana directly from Juan Sepulveda. He was advised that the marijuana he wanted to purchase was going to be transported to Tennessee on a Black Mountain tractor-trailer. Gilleland, with the assistance of Texas law enforcement officials, succeeded in finding this rig and observed its movements for the next couple of days. After the rig began its journey to Tennessee, it was stopped and searched. The search resulted in the seizure of 313 pounds of marijuana.
 
 
 5
 On December 8, 1993, defendant was charged in a 28-count indictment. A second superseding indictment was filed on February 22, 1994, in which defendant, along with 13 codefendants, was charged in a 31-count indictment. Defendant Sexton was charged on six counts of this indictment, including the following: Count One, engaging in a continuing criminal enterprise in violation of Title 21 U.S.C. § 848; Count Two, conspiring to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846; Counts Twenty-two and Twenty-five, distribution of marijuana in violation of 21 U.S.C. § 841(a)(1); Count Twenty-seven, using a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1); and Count Twenty-eight, traveling in interstate commerce with the intent to promote an illegal business in violation of 18 U.S.C. § 1952(a).
 
 
 6
 Defendant was arrested and held without bond pending a detention hearing. On May 2, 1994, defendant pled guilty to Count Two of the indictment charging a violation of 21 U.S.C. § 846 for conspiring to distribute marijuana. The Agreed Factual Basis submitted with the guilty plea stated the following:
 
 
 7
 From approximately mid-1992, defendant Gordon Sexton conspired together with other named and unnamed coconspirators in the distribution of marijuana.
 
 
 8
 It was a part of the conspiracy that the defendant would receive marijuana from codefendant Dean Jenkins who, in turn, received marijuana from Texas via tractor-trailer trucks. Gordon Sexton would in turn sell a quantity of the marijuana for Dean Jenkins, and then reimburse Dean Jenkins for the cost of the marijuana. During the course of the conspiracy, Gordon Sexton was involved in approximately five to six tractor-trailer loads of marijuana totaling 900 pounds.
 
 
 9
 On March 9, 1995, the government filed a notice and memorandum of intent to file a motion for downward departure at sentencing because defendant testified at codefendant Jenkins' trial.
 
 
 10
 On May 15, 1995, a sentencing hearing was held before the district court. The hearing reconvened on May 22, 1995, and defendant was sentenced to a term of imprisonment of 66 months. Because the court granted the government's motion for downward departure, this term of imprisonment was substantially below the applicable guideline range of 108 to 135 months.
 
 
 11
 Defendant filed a timely notice of appeal, challenging two sentencing enhancements under the United States Sentencing Guidelines.
 
 II.
 
 12
 Defendant argues that the district court erred in enhancing his sentence by two levels under U.S.S.G. § 2D1.1(b)(1) for possessing a firearm in relation to a drug trafficking offense. U.S.S.G. § 2D1.1, Application Note 3, states the following in part:
 
 
 13
 The enhancement for weapons possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.
 
 
 14
 Possession of a weapon is a factual determination which this court reviews under a clearly erroneous standard. The government has the burden of establishing the applicability of this Guideline, but once it is established that a defendant was in possession of a weapon during the commission of an offense, the burden is then on the defendant to show that the firearm is not connected with the offense. United States v. Calhoun, 49 F.3d 231, 236 (6th Cir.1995).
 
 
 15
 In the present case, the district court based its determination that defendant should receive this enhancement on testimony that occurred at the sentencing hearing on May 15, 1995. Tony Ginn, a government informant, testified that in September 1993 he and Agent Gilleland purchased five pounds of marijuana from defendant and codefendant Williams. Ginn testified that although on that occasion there were no guns visible during the deal, Ginn observed that when defendant put the money from the sale into his car, when he bent over, Ginn could see "the butt of a gun sticking out of his pocket."[1] Agent Gilleland testified at the sentencing hearing that he did not personally observe a gun in defendant's possession, but stated that he noticed a bulge in the defendant's right front pants pocket on this date and believed that bulge to be a gun. In addition, defendant Sexton was found to be in possession of several firearms at his residence on the date of his arrest.
 
 
 16
 At the sentencing hearing, Gilleland also testified that the informant Ginn had told him that defendant suspected Ginn was an informant and pulled out a revolver, cocked it, and put it against Ginn's head and told him if he "snitched them out," defendant would blow Ginn's head off. Gilleland testified that defendant also had described this incident in which defendant used a gun to threaten Ginn in order to protect his drug trafficking. Based on this evidence, we do not believe the district court was clearly erroneous in concluding that defendant possessed a firearm. Because, in addition, defendant failed to meet his burden of proving that it was "clearly improbable that the weapon was connected with the offense," application of the 2D1.1(b)(1) enhancement was appropriate. See U.S.S.G. § 2D1.1 comment, (n. 3); United States v. Calhoun, 49 F.3d 231, 236 (6th Cir.1995). Contrary to defendant's contention, under the Guidelines, a defendant can have his sentence enhanced for mere possession of a gun. It does not have to be used in the sense of active employment as is the case under 18 U.S.C. § 924(c). Bailey v. United States, 116 S.Ct. 501 (1995). The district court found the witnesses who testified that defendant had a gun during the purchase of marijuana and that defendant threatened Ginn with a gun in relation to drug trafficking to be credible. This determination is not clearly erroneous. Therefore, the district court is affirmed on this issue.
 
 III.
 
 17
 Defendant next argues that the district court erred in enhancing his sentence by four levels under U.S.S.G. § 3B1.1 for playing an aggravating role in the offense.
 
 
 18
 The district court's application of a sentencing enhancement under § 3B1.1 is reviewed for clear error. United States v. Ghazaleh, 58 F.3d 240, 246 (6th Cir.1995), cert. denied, 116 S.Ct. 716 (1996). Guideline § 3B1.1 states:
 
 
 19
 Based on the defendant's role in the events, increase the offense level as follows:
 
 
 20
 (a) if the defendant was an organizer or a leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 21
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 22
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 23
 U.S.S.G. § 3B1.1. Application Note 4 states:
 
 
 24
 In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others....
 
 
 25
 Defendant argues that the government was inconsistent in identifying the five or more persons whom defendant supervised. However, this concern is misplaced because the government is not required to demonstrate that defendant specifically supervised five or more people. As this court has stated in United States v. Bashara, 27 F.3d 1174, 1182 (6th Cir.1994), cert. denied, 115 S.Ct. 909 (1995), the government is required to show only that five or more persons participated in the criminal activity, and that defendant exercised control over at least one of the participants. In the present case, defendant admitted that he supervised his brother-in-law, codefendant Williams, and that the conspiracy contained more than five people. Defendant testified at the trial of codefendant Jenkins that he was involved in a conspiracy with Dean Jenkins, Juan and Gilbert Sepulveda, James Holt, and Charlie Williams. Therefore, the "number of people issue" is a red herring.
 
 
 26
 Although defendant concedes he was a manager or supervisor, he alleges he was not an organizer or leader and should not have received a four-level enhancement. He contends his role in the offense was to unload the marijuana from the tractor-trailers when they arrived in Tennessee, along with his brother-in-law Williams, whom he supervised.
 
 
 27
 The evidence also indicates that defendant built compartments in the tractor-trailers in order to conceal the marijuana under the direction of the owner of the vehicles, codefendant Jenkins. Defendant Sexton also admitted during his testimony at codefendant Jenkins' trial that he was the principal distributor of the marijuana. However, the evidence does not indicate whether he used other people to sell drugs for him or supervised anyone in the sale of drugs.
 
 
 28
 It is clear from the district court's order that the court applied this enhancement because defendant admitted that he was the principal distributor of the marijuana and supervised his brother-in-law in the unloading of the trucks. The district court stated that defendant had testified as follows:
 
 
 29
 Q. What, sir, was your involvement?
 
 
 30
 A. I purchased marijuana from Johnny [Juan Sepulveda] and resold it for him.
 
 
 31
 Q. How much marijuana would you purchase?
 
 
 32
 A. At that time, probably fifty to a hundred and fifty pounds.
 
 
 33
 Q. And how did you get that marijuana?
 
 
 34
 A. Johnny would let me have it. And when I sold it, I would pay him back.
 
 
 35
 Q. How did Johnny get the marijuana to you?
 
 
 36
 A. It was trucked on a Black Mountain Motor Lines' truck.
 
 
 37
 Q. Who made the arrangements?
 
 
 38
 A. I can't say for sure.
 
 
 39
 Q. How would you find out when the marijuana got here?
 
 
 40
 A. Usually when the truck came to Knoxville or maybe Chattanooga, well, I was called to come and unload it.
 
 
 41
 Q. Who would generally call you?
 
 
 42
 A. A truck driver.
 
 
 43
 Q. Who was that?
 
 
 44
 A. James Holt.
 
 
 45
 Q. Once he called you, what, if anything, would you do?
 
 
 46
 A. I would go get my brother-in-law, Charlie Williams, to go help me unload it.
 
 
 47
 Q. Once you got your brother-in-law, what action did you take?
 
 
 48
 A. We would take his car and go wherever the driver told us to come to.
 
 
 49
 In addition, Mr. Sexton testified as follows:
 
 
 50
 Q. Mr. Sexton, were you the principal distributor then?
 
 
 51
 A. Yes. I was.
 
 
 52
 The district court concluded in the sentencing order:
 
 
 53
 Therefore, Mr. Sexton identified himself as "the principal distributor," directing some individuals in a criminal activity involving co-defendants Dean Jenkins, Juan Sepulveda, Gilbert Sepulveda, Charlie Williams, James Holt, and Adolphus Boyd Buckner.
 
 
 54
 The district court applied the four-level enhancement for being an organizer and leader in part because defendant was the "principal distributor." However, this court in United States v. Gibson, 985 F.2d 860 (6th Cir.), cert. denied, 508 U.S. 979 (1993), indicated that a distributor, who merely buys drugs and then sells them to others, cannot have his sentence enhanced as an organizer or leader merely for being a distributor, standing alone. This court stated:
 
 
 55
 We also find persuasive the reasoning of United States v. Brown, 944 F.2d 1377 (7th Cir.1991), where the Seventh Circuit vacated a district court's application of Section 3B1.1(c) to a "middleman" in a drug distribution conspiracy. Noting that Section 3B1.1 requires "the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership," id. at 1385, the court stated: "The central concern of § 3B1.1 is relative responsibility. Under the Guidelines, those who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the illegal scheme. [The defendant's] status as a distributor, standing alone, does not warrant an enhancement under § 3B1.1." Id. at 1381.
 
 
 56
 Id. at 867.
 
 
 57
 We find that the present case is distinguishable from Gibson. The United States presented evidence that defendant supervised codefendant Williams in unloading the drugs from the trucks. Thus, there is "something more" to warrant the enhancement in addition to being a distributor. Defendant concedes he had a supervisory role and exercised control over Williams.
 
 
 58
 Moreover, defendant conceded in his testimony that he was the principal distributor and that he received marijuana from Sepulveda and then paid him for the cost of the marijuana, indicating he kept the profits for himself. Thus, there is evidence he was not just a middleman in the conspiracy, but played a key role. Being the principal distributor made defendant more than just the middleman as was the case in Gibson, and, furthermore, defendant supervised his brother-in-law in organizing the distribution of a principal amount of the drugs involved in the conspiracy.
 
 
 59
 The evidence supports the district court's determination that defendant was the principal distributor in a conspiracy that involved at least five people and supervised another person in distributing a principal amount of the drugs involved in the conspiracy. Given the large scale nature of the conspiracy and amount of drugs distributed, we find that his role as the principal distributor, who supervised another person, warrants a four-level enhancement for his central role in the conspiracy. We, therefore, affirm the district court on this issue.
 
 IV.
 
 60
 To conclude, the judgment of the district court is hereby AFFIRMED.
 
 
 
 [1]
 Contrary to defendant's contention, Ginn did not specify that the gun was in his rear or right front pocket