**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alexei Nuñez SARDINAS,**
**Defendant–Appellant.**

**No. 14–6523.**

United States Court of Appeals, Sixth Circuit.

March 25, 2016.

BEFORE: BATCHELDER and GRIFFIN, Circuit Judges; and CARR, District Judge.[*]

CARR, District Judge.

This is an appeal challenging the district court's application of a two-level leadership enhancement under United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(c).

---

[*] The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

In August 2014, a jury convicted appellant, Alexei Nuñez Sardinas, of conspiracy to distribute oxycodone. (R. 62, ID 188). Based on the Pre–Sentencing Report (PSR) (R. 88, ID 288–320), U.S.S.G. § 3B1.1(c) and other factors set forth in the sentencing guidelines, the district court sentenced him to ninety-six months in prison. (R. 85, ID 283–88).

Nuñez argues the district court's application of the U.S.S.G. § 3B1.1(c) enhancement was clearly erroneous. (Docs.24, 34).

For the following reasons, we affirm the district court's judgment.

## Background

Nuñez was born in Cuba, but has been a legal, permanent resident of the United States since 2011. (R. 88, ID 299, 304). Prior to this case, he had no criminal history. (*Id.* at 303).

Nuñez's co-conspirator, Luis Omar Benavides–Rodriguez, was born in Honduras. (R. 100, ID 547–48). In 2010, he was deported for entering the country illegally. He re-entered illegally in 2013, and has been living in the United States ever since. (*Id.*).

In January 2014, law enforcement officers began investigating Benavides's drug trafficking activities. (R. 99, ID 414–17, 415:6–7, 480–81). Officers learned of Benavides's illegal conduct through a confidential informant and from telephone records linking him to the Bonilla drug-trafficking organization. (*Id.* at 414–17, 415:5–7, 480–81, 515–16).

Officers monitored Benavides's movements, but never observed any drug transactions.[1] (*Id.* at 418–19, 432). They did, however, follow him into a Louisville apartment building where they recovered a bag of trash with mail identifying Nuñez as one of the building's occupants. (*Id.* at 448, 455–58).

After Benavides left the building, officers arrested him and found thousands of oxycodone pills in his car. (*Id.* at 440–41; R. 88, ID 301). They also found $10,200 and ledgers detailing drug transactions in his home. (R. 99, ID 468; R. 88, ID 301). Under questioning, Benavides told police Nuñez was his drug supplier. (R. 88, ID 301). Officers later found $119,000 in Nuñez's home and ledgers in another residence detailing numerous, high-volume drug transactions. (*Id.* at 301–02).

A federal grand jury indicted Benavides and Nuñez for conspiring to distribute oxycodone. (R. 12, ID 20–22). Benavides pleaded guilty to the charge and, in exchange for a lighter sentence,[2] cooperated against Nuñez, who proceeded to trial. (R. 100, ID 549–51).

During the trial, Benavides testified that Nuñez was his supplier.[3] (*Id.* at 559). According to Benavides, the relationship began when, at his request, Nuñez "fronted" him 300 pills. (*Id.* at 568–69). Thereafter, over six to eight purchases, Nuñez sold him an estimated 16,000 pills at $22 per pill, which he then resold for $24 per pill. (R. 88, ID 301–02; R. 100, ID 558–59, 569). Benavides did not specify who set those prices. (R. 100, ID 559, 581).

Benavides also testified that on two occasions, he delivered pills for Nuñez to a man named Chino. (*Id.* at 580, 596). Benavides did not know Chino and "never

---

1. Benavides admitted at trial he had sold hundreds of pills, several times, to at least four separate clients. (R. 100, ID 597–600).

2. Benavides received a fifty-month sentence. (R. 97, ID 348).

3. The government did not investigate whether Benavides also obtained pills from the Bonilla organization. (R. 99, ID 488–90).

had communications with him." (*Id.*). Indeed, Benavides was unsure whether the person to whom he delivered pills actually was Chino. (*Id.* at 596). Benavides testified that someone—presumably either Nuñez or Chino—paid him $1,000 for every 1,000 pills he delivered. (*Id.* at 580–81). Benavides did not know how much Chino paid Nuñez for the pills. (*Id.* at 581).

The jury convicted Nuñez, and a probation officer prepared a PSR for sentencing. (R. 62, ID 188; R. 88, ID 288–320).

The PSR calculated the marijuana equivalent of 16,000 pills to be 2,679.84 kilograms, resulting in a base offense level of 30. (*Id.* at 301–02). The district court adopted the PSR[4] and, at the government's request, enhanced Nuñez's sentencing guideline range by two levels for directing Benavides's activities during the conspiracy.[5] (R. 97, ID 345–46, 348). The court explained:

> Benavides testified that he got pills from Nuñez, Nuñez coordinated the buys, managed the money, managed the quantity of pills, set the prices, the method and manner of delivery. He said that he—this was all borne out and supported by not only surveillance but by Nuñez's telephone records that there were interactions between the two.
>
> Benavides said, however, that Nuñez gave him personal directions as to when, where and how to deliver the pills to the person named Chino.
>
> Yes, it's true that there isn't a lot of evidence to identify Chino or to lead to his arrest or conviction, but given the standard of proof here, and given the credibility of Mr. Benavides's testimony, which this Court found to be credible in light of all the other evidence in the case and [his] acceptance of responsibility, the Court finds that the two-point enhancement will stand and sustains the objection of the United States.

(*Id.* at 345–46).

The district court based its findings on Benavides's testimony and corroborating surveillance and telephone records. (*Id.* at 345).

Nuñez's resulting total offense level was 32 and his guideline range was 121 to 151 months. (*Id.* at 348). The district court departed downward from the guideline range because: 1) Nuñez had no criminal history; and 2) the scope and breadth of his organization were limited. (*Id.* at 353). Accordingly, the court sentenced him to ninety-six months in prison.[6] (*Id.*).

This appeal followed. (R. 86, ID 289).

## Standard of Review

We review the district court's sentence under an abuse-of-discretion standard. *See United States v. Baker*, 559 F.3d 443, 448 (6th Cir.2009). A sentence is procedurally unreasonable if the district court "fails to calculate (or improperly calculates) the Guidelines range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence."

---

4. "The district court is allowed to accept as true all factual allegations in a presentence report to which the defendant does not object." *United States v. Carter*, 355 F.3d 920, 925 (6th Cir.2004).

5. The PSR, as originally written, did not assign Nuñez any sentencing enhancements. The government objected, arguing for the two-level enhancement under U.S.S.G.

§ 3B1.1(c). The defense objected to the proposed enhancement both in a written response to the PSR and at sentencing.

6. Without the two-level enhancement, Nuñez's guideline range would have been 97 to 121 months. U.S.S.G. Manual ch. 5, pt. A (Sentencing Table).

*United States v. Aleo,* 681 F.3d 290, 298 (6th Cir.2012).

Due to the "factual nuances that a district court is better positioned to evaluate," we review the legal conclusion that a defendant played an aggravating role under U.S.S.G. § 3B1.1 under a deferential standard. *United States v. Washington,* 715 F.3d 975, 983 (6th Cir.2013). Thus, we review the district court's findings of fact at sentencing for "clear error." *Baker,* 559 F.3d at 448. "A factual finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ward,* 506 F.3d 468, 472 (6th Cir.2007) (internal quotation marks and citation omitted).

### Analysis

U.S.S.G. § 3B1.1 provides for increased adjustments to an offense level based on a defendant's aggravating role in the offense. A two-level enhancement is appropriate "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c).

U.S.S.G. § 3B1.1 cmt. 4 describes the factors a court should consider when determining whether a defendant occupied a leadership role in an offense:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

The government must "establish the existence of a factor supporting a sentencing enhancement by a preponderance of the evidence." *Aleo,* 681 F.3d at 298. "There is no requirement, however, that each factor be met." *United States v. Ospina,* 18 F.3d 1332, 1337 (6th Cir.1994). Rather, a defendant qualifies for a U.S.S.G. § 3B1.1 enhancement if a sentencing court "concludes that he has exercised decision-making authority, recruited accomplices, received a larger share of the profits, was instrumental in the planning phase of the criminal venture, *or* exercised control or authority over at least one accomplice." *United States v. Vasquez,* 560 F.3d 461, 473 (6th Cir.2009) (emphasis added).

Nuñez contends:

1) "The court impermissibly based the enhancement on conduct that was a mere buyer-seller relationship—in other words, nothing out of the ordinary to somehow warrant an enhancement;"

2) "[M]ere management of assets alone cannot justify the enhancement;"

3) The court "overlooked the enhancement's primary concern—relative responsibility between co-conspirators;" and

4) "[T]he government did not show the presence of any other interests that justify the enhancement"—*e.g.,* that Nuñez "profited more from the activity, that he posed a greater danger to society, or that he is more likely to recidivate."

(Doc. 24 at 11–12).

Nuñez's arguments lack merit.

To be sure, Nuñez "correctly notes that more than a mere buyer-seller relationship is required to support a finding that a defendant exercised a leadership or supervisory role in an offense; he mistakenly insists, however, that his relationship with [Benavides] was only such a buyer-seller relationship." *United States v. Gonzalez,* Nos. 93–1995, 93–2399, 1994 WL 589664, at *10 (6th Cir. Oct. 21, 1994).

Nuñez contends he merely "fronted" Benavides pills (*i.e.,* managed the assets), *see United States v. Dalton,* 574 Fed.Appx. 639, 650–51 (6th Cir.2014) ("[F]ronting drugs is merely a variant of a traditional buyer-seller relationship and, by itself, does not establish a drug-supplier's leadership or organizational role.") (citing *United States v. Ward,* 37 F.3d 243, 248 (6th Cir. 1994)), and negotiated the price with Chino, and therefore "acted as any other market actor, and not as a leader." (Doc. 24 at 20).

Though Nuñez accurately recites legal doctrine, the record is what matters. On the basis of the evidence, the district court found Nuñez: 1) provided pills to Benavides for delivery to Chino; 2) coordinated the buys; 3) managed the money; 4) set the prices; and 5) gave Benavides instructions regarding the time, place and manner of delivery. (R. 97, ID 345–46). The evidence also establishes that Benavides: 1) did not know Chino; 2) did not communicate with Chino; 3) did not know how Chino paid for the drugs; and 4) gained no profit from the transactions other than the fixed-rate fees he received for making the deliveries. (R. 100, ID 580–81, 596). Thus, it was Nuñez, not Benavides, who knew, communicated with, negotiated with and profited the most from Chino. *See Vasquez,* 560 F.3d at 473.

"Establishment of such an organizational structure and division of labor can provide sufficient evidence to support the con-clusion that [Nuñez] was an organizer, leader, manager, or supervisor of the criminal activity involved in [the conspiracy]." *Gonzalez,* 1994 WL 589664, at *11; *see also United States v. Sexton,* No. 95–5760, 1996 WL 366319, at *5 (6th Cir. June 28, 1996) (exercise of control over co-conspirator is "something more" than buying and selling drugs).

The limited size and scope of Nuñez's drug organization are not determinative. *See, e.g., United States v. Williams,* 894 F.2d 208, 214 (6th Cir.1990) (fact defendant obtained drugs from another source "does not preclude his role as an organizer or supervisor"); *Baker,* 559 F.3d at 449 (defendant need supervise only one other participant).

Nuñez further argues he could not have directed Benavides's activities because it was Benavides who first approached *him* about getting into the drug business. (Doc. 24 at 32–33). That argument misses the mark. Nuñez's sales to Benavides were separate and distinct from the deliveries to Chino. *See Williams,* 894 F.2d at 214 (U.S.S.G. § 3B1.1(c) applicable to single transaction in ongoing conspiracy). Benavides purchased and sold pills to profit from his part in the conspiracy, while deliveries to Chino largely benefited Nuñez. *See id.* (recruitment of an individual to complete even one narcotics delivery warrants leadership enhancement). Nuñez, or perhaps Chino, simply paid Benavides for services rendered. (R. 100, ID 580–81).

Finally, Nuñez contends the district court's application of the leadership enhancement failed to account for his "relative responsibility" for the conspiracy. (Doc. 24 at 29–24); *see United States v. Gibson,* 985 F.2d 860, 867 (6th Cir.1993) ("[T]hose who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the

illegal scheme."); U.S.S.G. Manual § 3B1.1 cmt. background (leadership adjustment should increase proportionally with, *inter alia*, the degree of defendant's responsibility).

To the contrary, Nuñez arranged all the logistics and details of sales to Chino; Benavides simply moved the packages. *See United States v. Gaitan–Acevedo*, 148 F.3d 577, 596 (6th Cir.1998) (leadership enhancement justified where defendant gave delivery person directions to drop location and made other "necessary arrangements"). Benavides's role in the conspiracy to sell drugs to Chino was relatively minor as compared to Nuñez's role. The district court's accounting for Nuñez's "relative responsibility" was therefore appropriate.[7] *See id.*

### Conclusion

In sum, the district court's application of a two-level leadership enhancement under U.S.S.G. § 3B1.1(c) was not clearly erroneous. *See Baker*, 559 F.3d at 448. There is therefore no basis for vacating Nuñez's sentence and remanding his case for resentencing.

Affirmed.

---

**7.** Citing § 3B1.1 cmt. background, Nuñez also argues the government failed to prove that, as compared to Benavides, he: 1) profited more from the conspiracy; 2) presented a greater danger to the public; and 3) was more likely to recidivate. (Doc. 24 at 34–36). Even assuming Nuñez is correct, the government need not prove every factor listed in U.S.S.G. § 3B1.1. *See Ospina*, 18 F.3d at 1337.